Judge TRAGER dissents in a separate opinion.
HALL, Circuit Judge:
The government appeals from an order entered in the United States District Court for the Southern District of New York (McKenna, J.) to suppress inculpatory statements made by defendant-appellee while in custody. We AFFIRM the order of the district court on the ground that the initial interrogation conducted by an investigator aware of the obvious need for a Miranda warning, followed 90 minutes later by a second, post-Miranda interrogation by the same investigator, on the same subject matter, under similar circumstances and with no explicit curative language amounted to a deliberate, two-step interrogation technique designed to undermine the defendant’s Miranda rights.
BACKGROUND
In March 2005, the United States Postal Service suspected defendant-appellee William Capers, employed as a mail handler, of stealing money orders from Express Mail envelopes. Postal Inspectors decided to conduct a sting operation targeting Capers. In December 2005, Inspectors planted two Express Mail envelopes in the mail-sorting facility where Capers worked. One envelope contained $30 cash, and the other contained two $80 money orders and was equipped with an alarm device. The alarm was set to trigger automatically in the event the envelope with the money orders was opened and its contents removed.
Haring planted the envelopes in a mail container, Postal Inspectors Hoti, Del Giudice, Moon, and Chow conducted surveillance of Capers throughout the day. At approximately 5 p.m., Capers noticed the envelopes for the first time. Approximately two hours later, Capers and Juan Lopez, a fellow employee, entered a trailer holding mail containers and briefly disappeared from the inspectors’ view. Less than one minute later, the alarm in the envelope sounded, and the postal inspectors rushed into the trailer to apprehend both Capers and Lopez. The inspectors handcuffed both suspects. Inspector Hoti instructed Capers to follow him into a supervisor’s office. Inspectors Del Giudice and Moon also entered the office. They instructed Capers to sit in a chair, still handcuffed, while the three inspectors stood around him. None of the inspectors gave Capers a Miranda warning.
According to the testimony of Del Giudice, Hoti said to Capers: *473 (Hr’g Tr. 95, Sept. 5, 2006.) Hoti then asked Capers where the contents of the Express Mail envelope were located. Capers gestured toward his right side pants pocket, and Hoti asked Capers what was in his pocket. Capers replied the money orders. (Hr’g Tr. 34.) Hoti asked for Capers’ permission to “grab” them, and when Capers said “yes,” Hoti removed the money orders from Capers’ pocket. (Hr’g Tr. 34.) Hoti asked Capers if the money orders belonged to him, and Capers said no. (Hr’g Tr. 34.) Capers told Hoti that he got the money orders from the Express Mail envelope. (Hr’g Tr. 64.) Hoti also questioned Capers about the $30 cash that had been planted in the other Express Mail envelope, but Capers stated that he did not know anything about it. The entire questioning took less than five minutes. Regarding the lack of a Miranda warning, Hoti testified that he did not read Capers his rights because he was in a hurry to track down the missing money orders so that they did not get lost in the large mail-sorting facility and because he needed to question Lopez, who was held handcuffed outside the supervisor’s office, to determine his level of involvement in the crime.
*472 something like, look, you know, talk to me or don’t talk to me, I don’t care but I’m telling you right now or I’ll tell you that I’m going to do my best to make you go away, and I just want you to know. And I’ve been watching you all day. I know everything that you did tonight.
*473 Del Giudice and Moon then escorted Capers to a van to transport him to another Postal Service facility (the “Bronx Domicile”) for further questioning. They waited in the van for approximately 15 to 20 minutes while the other inspectors located the alarm device from the opened envelope. In the van, Del Giudice engaged Capers in conversation primarily about Capers’ automobile. Capers remained handcuffed throughout this time, which included 15 to 20 minutes of waiting and 20 minutes of driving to the Bronx Domicile.
When they arrived at the Bronx Domicile, the inspectors placed Capers in an interview room and handcuffed him to the chair in which he sat. Del Giudice and Moon remained with him, engaging him in further conversation, and gathering relevant personal information from Capers for their paperwork. At one point, Capers asked Del Giudice about the possibility of being fired, and Del Giudice told him that “it’s in your best interest to tell the truth when Inspector Hoti comes down. Be honest. It’s always better if you’re honest.” (Hr’g Tr. 117.)
Capers and the two postal inspectors waited for approximately 30 to 40 minutes until Hoti entered the room. Hoti then advised Capers of his Miranda rights. Hoti made no reference, however, to the statements Capers had already made during the initial interrogation. Hoti explained in his testimony, “I don’t remember the specific question and its sequence, and I don’t see a need to say what did you do with the contents of this Express Mail when I already have the answer to that. So I would not have asked that same question.” (Hr’g Tr. 72.) Capers signed a Postal Service Warning and Waiver of Rights form, and Hoti proceeded to question Capers about the events of the evening, specifically asking about what he did with the Express Mail envelopes earlier that night. Capers verbally confessed to taking the money orders. When Hoti asked him to provide a written statement, Capers replied by asking, ‘What’s in it for me?” (Hr’g Tr. 51.) Hoti told Capers “there’s nothing I can promise you,” and then ended the questioning. (Hr’g Tr. 51.)
Capers was indicted in March 2006, charged with one count of theft of mail matter by a postal employee, in violation of 18 U.S.C. § 1709. He moved to suppress the inculpatory statements he made both before and after receiving the Miranda warning, and on March 30, 2007, the district court entered an order suppressing the statements. The district court found *474 that “[t]he government has not shown that ... defendant relinquished his right to remain silent voluntarily with a full awareness of the rights being waived and the consequences of doing so.” United States v. Capers, No. 06 Cr. 266, 2007 WL 959300, at * 15 (S.D.N.Y. Mar.29, 2007) (internal quotation marks omitted). Although the district court found that the postal inspectors did not have the “specific intent” to circumvent Capers’ Miranda rights, id., it did find their interrogation tactics deprived Capers of a “genuine right to remain silent,” id. at * 14. The United States filed a timely notice of appeal.
DISCUSSION
I. Standard of Review
“We review a district court’s determination regarding the constitutionality of a Miranda waiver de novo.” United States v. Carter, 489 F.3d 528, 534 (2d Cir.2007). In doing so, we review “a district court’s underlying factual findings for clear error.” Id.
II. Miranda and the Two-Step Interrogation Technique
The issue before us is whether Hoti and the other postal inspectors deliberately deprived Capers of the rights to which he is entitled under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The government argues that the defendant was given an effective Miranda warning prior to making voluntary inculpatory statements, and therefore the statements he made following the warning should not have been suppressed by the district court. Capers argues that the rule that the Supreme Court announced in Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), and that this Court further clarified in Carter, requires us to conclude that the postal inspectors’ two-step interrogation in this case constituted a deliberate violation of Capers’ Miranda rights.
“The purpose of the Miranda warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary.” Carter, 489 F.3d at 534. The Supreme Court, in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and Seibert, 542 U.S. 600, 124 S.Ct. 2601, has twice addressed situations like this one in which a suspect in custody confessed without having received a Miranda warning, subsequently received a Miranda warning, and then confessed again.
Elstad involved a situation in which a suspect made a self-incriminating statement while two police officers were at his home investigating a robbery. At the time he had not received a Miranda warning. Elstad, 470 U.S. at 300-01, 105 S.Ct. 1285. The officers transported the suspect to a police station where they gave him a Miranda warning prior to obtaining both an oral and written confession. Id. at 301, 105 S.Ct. 1285. At trial, the defendant moved to suppress the postwarning confessions on the ground that the statements made at the police station only came about as a result of the first inadmissable statement made at his house. Id. at 302, 105 S.Ct. 1285. The Supreme Court ultimately rejected the “fruit of the poisonous tree” argument, see Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and held that “[tjhough Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made,” Elstad, 470 U.S. at 309, 105 S.Ct. 1285. The Court reasoned that the police did not employ any coercive tactics to elicit *475 either confession and that the defendant made his postwarning confession voluntarily. Id. at 316, 105 S.Ct. 1285. The Court concluded that “the dictates of Miranda and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case.” Id. at 318, 105 S.Ct. 1285.
Whereas Elstad involved a good-faith effort by the police to administer a proper Miranda warning, Seibert addressed the use of a two-step interrogation strategy designed to elicit a post-Miranda waiver and confession after the defendant had already confessed before he was given Miranda warnings. In Seibert, the police department had a policy of withholding Miranda warnings until an arrestee confessed and then reading the arrestee Miranda warnings and asking for a waiver prior to eliciting a second confession. Seibert, 542 U.S. at 609-10, 124 S.Ct. 2601 (plurality opinion).[1] The police in Seibert employed this strategy when they arrested the defendant for setting a fire that killed a teenager. Id. at 604, 124 S.Ct. 2601. After taking the defendant into custody and deliberately withholding Miranda warnings, the police elicited a confession. Id. at 604-05, 124 S.Ct. 2601. The police then gave the defendant a 20-minute break after which they provided her Miranda warnings, obtained a signed waiver of rights, and tape-recorded a second confession. Id. at 605, 124 S.Ct. 2601. A majority of the Court admonished against the use of this “question-first” technique and held that this strategy violated Miranda. Id. at 617, 124 S.Ct. 2601; id. at 620-21, 124 S.Ct. 2601 (Kennedy, J., concurring).
The Seibert plurality concluded that “[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.” Id. at 613, 124 S.Ct. 2601 (plurality opinion). The plurality focused on whether the midstream Miranda warning was effective, and questioned whether “it would be reasonable to find that in these circumstances the warnings could function ‘effectively’ as Miranda requires .... [and] advise the suspect that he had a real choice about giving an admissible statement at that juncture.” Id. at 611-12, 124 S.Ct. 2601. Writing for the plurality, Justice Souter laid out five factors to be weighed when analyzing the effectiveness of the warning: (1) “the completeness and detail of the questions and answers in the first round of interrogation,” (2) “the overlapping content of the two statements,” (3) “the timing and setting of the first and second” interrogation, (4) “the continuity of police personnel,” and (5) “the degree to which the interrogator’s questions treated the second round as continuous with the first.” Id. at 615, 124 S.Ct. 2601.
The plurality voted to suppress the second confession because, unlike in Elstad, the unwarned interrogation was “systematic, ejdiaustive, and managed with psychological skill.” Id. at 616, 124 S.Ct. 2601. Applying the five factors, the plurality focused on the facts that: both phases of questioning occurred while the suspect was clearly in custody; there was no advice given to the suspect that her first statement was inadmissible; the same police *476 officer conducted both interrogations in the same location with only a 15 to 20 minute break between the two; and references to the earlier confession fostered an “impression that the further questioning was a mere continuation” of the first interrogation. Id. The plurality ultimately concluded that “[t]hese circumstances must be seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect’s shoes would not have understood them to convey a message that she retained a choice about continuing to talk.” Id. at 617, 124 S.Ct. 2601.
Justice Kennedy agreed with the plurality’s conclusion that the postwarning statements should be suppressed, but he believed the plurality’s test “cut too broadly,” id. at 622, 124 S.Ct. 2601 (Kennedy, /., concurring), because it applied in instances of “both intentional and unintentional two-stage interrogations,” id. at 621, 124 S.Ct. 2601. Under Justice Kennedy’s approach, the first question would be whether law enforcement officers used a “deliberate two-step strategy” in “a calculated way to undermine the Miranda warning,” id. at 622, 124 S.Ct. 2601, and “to obscure both the practical and legal significance of the admonition when finally given,” id. at 620, 124 S.Ct. 2601. If the answer to that question were “no,” then the suppression analysis would be governed by the voluntariness standard set forth in Elstad. Id. If the answer were “yes,” however, the next question would be whether any curative measures were taken “to ensure that a reasonable person in the suspect’s situation would understand the import and effect of the Miranda warning and of the Miranda waiver.” Id. Justice Kennedy provided two examples of such curative measures: (1) “a substantial break in time and circumstances between the prewarning statement and the Miranda warning ... [because] it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn”; and (2) “an additional warning that explains the likely inadmissibility of the prewarning custodial statement.” Id. Reasoning that the police had used a deliberate two-step interrogation technique and that no curative steps had been taken, Justice Kennedy concluded that the post-warning statements were inadmissible. Id.
In Carter, this Court joined the Eleventh, Fifth, Ninth, Third, and Eighth Circuits in applying Justice Kennedy’s approach in Seibert, holding that “Seibert lays out an exception to Elstad for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession.” Carter, 489 F.3d at 535. Cf. United States v. Street, 472 F.3d 1298, 1312 (11th Cir.2006); United States v. Courtney, 463 F.3d 333, 338 (5th Cir.2006); United States v. Williams, 435 F.3d 1148, 1157 (9th Cir.2006); United States v. Kiam, 432 F.3d 524, 532 (3d Cir.2006); United States v. Hernandez-Hernandez, 384 F.3d 562, 566 (8th Cir.2004). But see United States v. Heron, 564 F.3d 879, 884-85 (7th Cir.2009) (Justice Kennedy’s concurrence is not controlling). In Carter, law enforcement agents recovered a large bag of drugs after searching a restaurant owned and operated by the suspect. Id. at 531. Approximately 30 minutes after the search concluded, an agent noticed the suspect sitting outside the restaurant and, in a casual fashion, asked him about a brown substance found in the bag of drugs. The agent asked if the substance was heroin, and the suspect replied, “No, it’s bad.” Id. at 532. The agent then asked, “Bad what?,” to which the suspect replied, “Bad coke.” Id. The agent later testified that he asked the suspect about the drugs solely “out of curiosity.” Id. Approximately 30 *477 minutes later, after the defendant was given a Miranda warning and after he signed a Miranda waiver form, a different agent conducted a formal interrogation and elicited a full confession. Id. at 533. The latter agent had no knowledge of the suspect’s previous statement about the brown substance and did not learn about it until shortly before the trial commenced. Id. The defendant moved to suppress the second confession on the grounds that he did not knowingly and voluntarily waive his Miranda rights. Id. at 534.
Analyzing “[t]he factual differences between [Carter’s] case and Seibert,” id. at 536, we determined that the agents in Carter did not deliberately use a two-step interrogation strategy designed to circumvent Miranda for three reasons: (1) there was almost no overlap between the suspect’s first statement and his subsequent confession; (2) different officers questioned the suspect at different locations (the first outside the store that was being searched and the second in an interrogation room), and the second officer was not aware of the suspect’s previous inculpatory statement; and (3) “the postwarning questioning was not a continuation of the prewarning question.”[2] Id. at 536. Accordingly, applying Elstad, we determined that Carter’s postwarning statement was made knowingly and voluntarily, and it was properly admissible at trial. Id. at 536-37.
Here, in a decision that predated Carter, the district court found that Capers did not give his post-Miranda warning statement “voluntarily with a full awareness of the rights being waived and the consequences of doing so.” Capers, 2007 WL 959300, at * 15 (internal quotation marks omitted). For that reason, it suppressed Capers’ statement. In so doing, the district court rejected Justice Kennedy’s approach in Seibert, explaining that Justice Kennedy’s concurring opinion “cannot reasonably be taken to be the law of the land,” because it did not represent the majority opinion of the Supreme Court. Id. at *11 (internal quotation marks omitted).
In a footnote to its decision, the district court remarked that “if Justice Kennedy’s Seibert concurrence represented the law, suppression would be denied.” Capers, 2007 WL 959300, at *15 n.17. The district court based this statement, which under the circumstances constituted dictum, on its understanding that Justice Kennedy’s test turned on “the subjective intent of the police,” id. at *10, coupled with the district court’s own determination that the inspectors in this case did not have the “specific intent” to evade Miranda, id. at *12.
Our intervening decision in Carter, however, requires a different analysis. Under Carter, we must address whether the officers employed a “deliberate, two-step strategy, predicated upon violating Miranda during an extended interview,” Seibert, 542 U.S. at 621, 124 S.Ct. 2601, and if so, whether “specific, curative steps,” id., were taken to obviate the violation that occurred.
III. Deliberateness
In Seibert, because the record was clear that the interrogating officers intentionally and purposefully employed a technique in which they had been instructed, id. at 609-10, 124 S.Ct. 2601, Justice Kennedy had no reason to explore how a court should determine when a two-step interrogation strategy had been executed deliberately. *478 Wrestling with the problem we now address, the Ninth Circuit has stated:
As an initial matter, we note that Justice Kennedy did not articulate how a court should determine whether an interrogator used a deliberate two-step strategy- • • •
For example, Justice Kennedy’s opinion is silent as to what, if any presumptions apply or which party bears the burden of proving or disproving deliberateness.
United States v. Williams, 435 F.3d 1148, 1158 & n. 11 (9th Cir.2006).
In constructing a method to determine deliberateness, the Ninth Circuit in Williams looked to whether “objective evidence and any available subjective evidence, such as an officer’s testimony, support an inference that the two-step interrogation procedure was used to undermine the Miranda warning.” Id. at 1158. Following on the Ninth Circuit’s guidance, the test articulated by the Eleventh Circuit to determine deliberateness relies upon “the totality of the circumstances including ‘the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements.’ ” United States v. Street, 472 F.3d 1298, 1314 (11th Cir.2006) (quoting Williams, 435 F.3d at 1159). The Fifth Circuit’s articulation of when deliberateness may be inferred also relies upon the totality of the circumstances surrounding the interrogations:
[Tjhere was nothing in the circumstances or the nature of the questioning to indicate that coercion or other improper tactics were used. All evidence suggests that Nunez was calm and cooperative, and the agents did not act with aggressiveness or hostility. The district court stated that “the defendant initially had done nothing more than voluntarily respond to questions as to his name, place of birth, and immigration status.”
United States v. Nunez-Sanchez, 478 F.3d 663, 668-669 (5th Cir.2007).[3]
In our Court’s opinion in Carter, 489 F.3d at 528, without expressly stating that we were doing so, we similarly analyzed objective factors. In the context of the interrogation that took place there, we needed only to consider three factors to conclude that the interrogating officers did not deliberately employ a two-step interrogation procedure: (1) there was no overlap between the suspect’s first and second statements; (2) different officers questioned the suspect at different locations, and the second officer was not aware of the suspect’s previous inculpatory statement; and (3) “the postwarning questioning was not a continuation of the prewarning question[ing].” Carter, 489 F.3d at 536.
These considerations, while determinative of the analysis of deliberateness on the facts presented in Carter, are by no means the only factors to be considered when seeking to divine whether the officers’ actions are sufficiently indicative of a deliberate circumvention of Miranda to *479 require that a defendant’s statements must be suppressed. We recognize the wisdom of Justice Souter’s observation that “the intent of the officer will rarely be as candidly admitted as it was” in Seibert, where the interrogating officer testified not only that he was trained to execute a two-step interrogation procedure but also implied that the tactic is taught nationwide. Seibert, 542 U.S. at 616 n. 6, 124 S.Ct. 2601. In light of the above, we join our sister circuits in concluding that a court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence. Cf. Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, concurring) (“[A] multifactor test that applies to every two-stage interrogation may serve to undermine th[e] clarity [of Miranda ].”).
Recognizing the inherent difficulty in proving deliberateness, and also conceding that “determining the officer’s state of mind at the time of the interrogation can be difficult,” we turn to the unsettled question of which party bears the burden of proving deliberateness or absence thereof. United States v. Ollie, 442 F.3d 1135, 1142 (8th Cir.2006). For the following reasons, we hold that the burden rests on the prosecution to disprove deliberateness.
“[Wjhen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered.” Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Accordingly, courts place upon the government the burden to prove that a defendant’s confession was voluntary. See, e.g., Colorado v. Connelly, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The question of deliberateness, while distinct from voluntariness, will nonetheless be dispositive of a defendant’s challenge to the voluntariness of a confession garnered from a two-step interrogation procedure. See United States v. Stewart, 536 F.3d 714, 719 (7th Cir.2008). The Eighth Circuit, which also places the burden on the government to disprove deliberateness, cautioned that while “the law generally frowns on requiring a party to prove a negative,” the Supreme Court has consistently required the government to prove the admissibility of a confession against a criminal defendant, Ollie, 442 F.3d at 1143. See also Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (requiring the government to show that a confession was not the fruit of an earlier illegal arrest); Connelly, 479 U.S. at 168, 107 S.Ct. 515 (requiring the government to show that defendant’s Miranda waiver given during an alleged psychotic episode, was knowing and voluntary).
Indeed, the Supreme Court has “always set high standards of proof for the waiver of constitutional rights.... ” Tague v. Louisiana, 444 U.S. 469, 470, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980). In Tague, the Court held: “Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.” Id. Guided by Tague, we are mindful that evidence of deliberateness or lack thereof is similarly in the hands of the government, and we are further persuaded that the party seeking to introduce the confession should remain responsible for showing that it was not obtained through a subterfuge.
*480 With respect to the quantum of proof necessary, we are mindful that Miranda may impose a “heavy burden [upon] the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination,” and that in order to satisfy that burden a “high standarfd] of proof’ is applicable. Berghuis v. Thompkins, — U.S. -, 130 S.Ct. 2250, 2272, 176 L.Ed.2d 1098 (2010) (Sotomayor, dissenting). Nonetheless, “[w]henever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our Miranda doctrine, the State need prove waiver only by a preponderance of the evidence.” Connelly, 479 U.S. at 168, 107 S.Ct. 515. We apply the preponderance standard to Miranda challenges in recognition that Miranda is an exclusionary rule “aimed at deterring lawless conduct by police and prosecution,” and that imposing a higher burden of proof would do little to mitigaté prosecutorial overreaching while at the same time concealing troves of probative evidence from the eyes of the jury. Twomey, 404 U.S. at 489, 92 S.Ct. 619. For similar reasons, we hold that the government must meet its burden of disproving the deliberate use of a two-step interrogation technique by a preponderance of the evidence.
Looking to the totality of the circumstances in the case before us, the evidence proffered by the government to show that Capers was not the subject of a deliberate, two-step interrogation is outweighed by subjective and objective evidence to the contrary. Hoti testified that he delayed issuing a Miranda warning because his “mindset was on, one ... recovering evidence, ... [a]s well as determining if the two of them or if — either both of them or only one of them had any role to play in committing the crime.” (Hr’g Tr. 65.) Hoti testified that he was concerned about losing the money orders in the “very, very large” facility because the money orders were about the size of a U.S. dollar and the defendants could “toss them, hide them ... [and] [y]ou’d have a real, real tough time finding [them] in this large facility like that with all the packages and other types of mail.” (Hr’g Tr. 31-31.) As to making a determination about defendant Lopez, Hoti testified that “[i]f I could determine fairly quickly that, in fact, he had no role to play in that crime, I need to take those cuffs off and basically cut him loose.” (Hr’g. Tr. 35.) When asked whether he was in a position to read Capers his Miranda warnings before asking him about the money orders, Hoti replied “absolutely.” (Hr’g. Tr. 65.)
The district court concluded from this testimony that Hoti’s purpose in delaying a Miranda warning was not to undermine Capers’ Fifth Amendment rights, but rather “to prevent the loss or concealment of the currency and money orders that the Express Mail envelopes contained, and to ascertain whether Lopez was involved in the crime, so that he could be freed or not.” Id. at *12 n. 13 (citation omitted). Neither of these reasons, however, justifies delaying a Miranda warning once it is obvious that a suspect is in custody. There is no exception to Miranda that allows a delay in giving Miranda warnings in order to preserve evanescent evidence. Neither is there an exception to Miranda that permits delaying the warnings in order to ascertain whether a suspected co-conspirator may be entitled to release. Indeed, we agree with the Williams Court in its observation that
[o]nce a law enforcement officer has detained a suspect and subjects him to interrogation ... there is rarely, if ever, a legitimate reason to delay giving a *481 Miranda warning until after the suspect has confessed. Instead, the most plausible reason ... is an illegitimate one, which is the interrogator’s desire to weaken the warning’s effectiveness.
435 F.3d at 1159. The only legitimate reason to delay intentionally a Miranda warning until after a custodial interrogation has begun is to protect the safety of the arresting officers or the public — neither of which was an issue here. See, e.g., United States v. Newton, 369 F.3d 659, 677 (2d Cir.2004) (recognizing this “narrow exception” to the Miranda rule).
Inexperience, while not a legitimate excuse for postponing a Miranda warning, nevertheless may save a confession from exclusion under Seibert. See United States v. Naranjo, 426 F.3d 221, 232 (3d Cir.2005) (implying that an “inadvertent” Miranda omission, or a “rookie mistake,” should not warrant Seibert scrutiny). In the case before us, however, sufficient subjective evidence was adduced to rule out the officers’ inexperience as well as raise significant doubts as to whether a mistake had been made. The district court found it clear from Hoti’s testimony and from his experience in law enforcement that his failure to Mirandize Capers was not an accident. The district court explained: “Inspector Hoti did not merely forget to give defendant Miranda warnings. Inspector Hoti had served as a New York City police officer for some three years, and as Inspector Del Giudice testified, postal inspectors are ‘trained to provide Miranda when there is a custodial interrogation.’ ” Capers, 2007 WL 959300 at *12 (quoting Hr’g Tr. 165). Indeed, Hoti explicitly testified that he “absolutely” was in a position to inform Capers of his Miranda rights once Capers was confined to the supervisor’s office. (Hr’g Tr. 65.) The arrest of Capers did not occur “out of the blue,” as it might were Hoti driving to work and witnessed a crime in progress, or were he responding to a radio call reporting a crime in progress. Capers’ arrest was the culmination of a nine-month investigation into Capers’ suspected criminal activity. In surveiling Capers and determining when to give the order to his team to descend on Capers and Lopez, therefore, Hoti had time to think through what procedural steps he would need to take following arrest in order to build his case for prosecution. Because, as the district court found, Hoti had sufficient experience to know that a Miranda warning was unquestionably necessary in connection with Capers’ post-arrest interrogation, the corollary to that finding must also obtain. Hoti was experienced enough to know that in this case there was no valid reason to delay a Miranda warning until after questioning a suspect in custody.
The district court found that there was “no evidence ... that Inspector Hoti had the specific intent to use the two-stage questioning technique” to undermine Capers’ Miranda rights. Capers, 2007 WL 959300 at *12. The dissent endorses this finding, arguing that “there is nothing suspicious about the reasons put forth by Inspector Hoti.” Dissent at 492. Considering the totality of the circumstances, however, we find Inspector Hoti’s proffered reasons for delaying the Miranda warning to lack not only legitimacy, but also credibility. Inspector Hoti explained that he delayed informing Capers of his Miranda rights because Hoti had to determine if Lopez was involved in the scheme, and if he was not, release him. If Capers had told Inspector Hoti during the initial interrogation that Lopez had nothing to do with the scheme, would Inspector Hoti, who had just witnessed the two men enter a storage container and the envelope alarms subsequently sound, then have released Lopez on his own recognizance? We consider such a conclusion dubious. With respect to Hoti’s claim that he did not want to lose *482 the money orders and cash in the large postal facility, this assertion is belied by the testimony of the arresting officers that Capers and Lopez were detained almost directly after the envelope alarm sounded and were found either still in the storage container, or in that immediate vicinity. In light of the above, as well as objective evidence discussed below, the district court’s finding that there was “no evidence” of a deliberate, two-step interrogation tactic at work was clear error. Capers, 2007 WL 959300 at *12.
The dissent asserts that the “test used by the majority to determine whether Inspector Hoti deliberately utilized a two-step interrogation technique effectively undermines the subjective test established by Justice Kennedy ... because it ignores subjective evidence showing that the inspector did not deliberately utilize a two-step technique, and instead relies exclusively on the objective factors listed in the non-controlling Seibert plurality opinion.” Dissent at 491. This conclusion misreads our analysis and conflates Justice Kennedy’s test with that articulated by Justice Breyer in his concurring opinion in Seibert. 542 U.S. at 617, 124 S.Ct. 2601 (Breyer, J., concurring) (“Courts should exclude the ‘fruits’ of the initial unwarned questioning unless the failure to warn was in good faith.”) (citations omitted). By contrast, our analysis considers the subjective evidence adduced at the suppression hearing in the context set forth by Justice Kennedy — as instructive but not automatically dispositive. Justice Kennedy’s concurrence in Seibert does not advocate a test whereby a deliberate two-step interrogation will be found only when a law enforcement officer admits to executing such a strategy. Nor does this test envision blind, unquestioning reliance on the testimony of arresting and interrogating officers. To the contrary, because Justice Kennedy’s test seeks to exclude only those statements that are the result of deliberate and calculated police strategies to undermine Miranda, a searching and penetrating inquiry of the officer’s testimony and proffered reasons for delaying Miranda warning is therefore necessary to determine when these strategies are being employed.
The dissent asserts that the above consideration “gives absolutely no weight to the inspector’s testimony that his reasons for not immediately advising Capers of his Miranda rights were to prevent the loss or concealment of the currency and money orders that the Express Mail envelope contained and to ascertain whether Lopez was involved in the crime.” Dissent at 492. The dissent argues that Judge McKenna “witnessed Inspector Hoti’s testimony and was therefore better able to assess his credibility.” Dissent at 492. Although appellate courts do not have the opportunity to observe witness testimony and are, therefore, precluded from making credibility determinations, in light of the clear inconsistency between Inspector Hoti’s stated reasons for delaying Miranda warnings and the objective and subjective evidence constituting the remainder of the record bearing on this point, it is clear the district court’s determination “that there is no evidence ... Inspector Hoti had the specific intent to use the two-stage questioning technique with the purpose of first obtaining unwarned incriminating statements in order, in a subsequent warned interrogation, to obtain similar incriminating statements,” Capers, 2007 WL 959300 at *12, afforded blind and absolute weight to the testimony of the arresting officers and ignored all the other relevant evidence which we here announce must *483 also be considered.[4] If Justice Kennedy’s test is to have any meaning outside of the unique and never-again-to-be-repeated circumstances of Seibert, the district court’s unidimensional analysis cannot be determinative of the outcome in this case.
Objective evidence also leads us to conclude that the Government has failed to meet its burden of demonstrating that Capers was not subjected to a two-step interrogation. First, there is considerable overlap between the statements elicited from the defendant during the first and second interrogation. Hoti’s initial interrogation of Capers resulted in a confession and “there remained ‘little, if anything, of incriminating potential left unsaid.’ ” Capers, 2007 WL 959300, at *13 (quoting Seibert, 542 U.S. at 616, 124 S.Ct. 2601 (plurality opinion)). The circumstances surrounding the two sessions of the interrogation, including the nature of the respective environs in which the interrogation took place and the continuity of the cast of interrogating officers, was indicative of a deliberate two-step interrogation. While the location of the interrogation sessions changed, the first taking place in a room at the post office and the second in the Domicile, the inquisitorial environment of the questioning was consistent.
Unlike in Carter, the initial conversation between Capers and Hoti was in no way casual. See Nunez-Sanchez, 478 F.3d at 663-69. It began with Hoti’s opening statement to Capers that “I’m going to do my best to make you go away, and I just want you to know.” (Hr’g Tr. 95.) Capers was handcuffed throughout the process. On the facts presented, the district court correctly concluded, and we agree, that Hoti’s initial questioning was indeed a formal interrogation. See Capers, 2007 WL 959300, at *4 (concluding that Capers was in custody from the moment he was handcuffed).
Between the two phases of the interrogation, Hoti’s fellow inspectors engaged Capers in “small talk,” and advised him that it was in his interest to tell the truth when Hoti arrived. Capers continued to be handcuffed throughout the process. The second phase of the interrogation also opened with a hostile remark, namely Hoti’s observation that Capers was “one of the most laziest employees I’ve ever seen.” Cf. Nunez-Sanchez, 478 F.3d at 668-69 (finding that there was “no evidence of a deliberate attempt to employ a two-step strategy” because, inter alia, “the agents did not act with aggressiveness or hostility”). In combination with the Miranda warning, the inspectors clearly established that this second encounter was not a casual conversation. For the most part there was also continuity in the officers present at both interrogations. During the first interrogation Hoti asked the questions, while Del Giudice and Moon were present in the room. The second interrogation, at the outset, involved the same three inspectors with Hoti again asking the questions and Del Giudice and Moon remaining silent.
*484 Finally, the temporal proximity of the pre- and post-warning interrogations, along with the continuity of Caper’s custody, reasonably leads to the conclusion that the latter was a continuation of the former. Only 90 minutes separated the two interrogation sessions. And while not carried out to the degree it was in Seibert, at least to some extent the latter session was “essentially a cross-examination using information gained during the first round of interrogation.” See Carter, 489 F.3d at 536. Accordingly, the government has not produced sufficient objective evidence to meet its burden to dispel a conclusion that Hoti’s conduct amounted to a deliberate “question first” interrogation tactic designed to undermine Capers’ exercise of his Miranda rights.[5]
IV. Curative Measures
Deliberateness having been established, we must next consider whether any curative measures intervened to restore the defendant’s opportunity voluntarily to exercise his Miranda rights. See Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring) (“[P]ostwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.”). As noted, Justice Kennedy provided two examples of potential curative measures: (1) “a substantial break in time and circumstances between the prewarning statement and the Miranda warning,” and (2) “an additional warning that explains the likely inadmissibility of the prewarning custodial statement.” Id. Based on the facts before us, we cannot say that any such curative measure occurred such that it rendered effective the Miranda warnings given to Capers before the second interrogation.
As discussed, although approximately 90 minutes passed between the first and second interrogations, the two rounds of questioning bracketed one continual process. Del Giudice and Moon were with Capers throughout the 90 minutes, engaging in “small talk” and advising Capers to tell the truth. Despite the different locations of the interrogation sessions, both occurred while Capers remained in handcuffs and in settings that clearly established the authoritative nature of the questioning. There is little meaningful difference between the circumstances surrounding Capers’ two interrogation sessions, and there was certainly no “substantial break” that would have restored his Miranda rights.
Moreover, despite Hoti’s knowledge that Capers’ first statement would be inadmissable in court, he never alerted Capers to that fact. Capers, 2007 WL 959300, at *14. Hoti continued his line of questioning without dispelling Capers’ probable assumption that he had already incriminated himself based on his first confession. Hoti revealed as much in his testimony. When *485 asked whether he posed some of the same questions at the Bronx Domicile as he had asked earlier in the supervisor’s office, Hoti replied that he did not see the need to ask the same questions for which he already had answers. (Hr’g Tr. 72.) By the same token, Hoti did build on Capers’ admission of theft in the original session by structuring the second interrogation session to elicit a play-by-play description of how Capers went about stealing the money orders. Capers thus had no reason to know that his first broad confession could not be used against him when, only 90 minutes later while still in close custody, he actually “waived” his Miranda rights.[6] On these facts, there were no measures taken to cure the inspectors’ use of the deliberate, two-step interrogation strategy. Because on the objective and subjective evidence we are left to conclude that the inspectors employed a strategy to circumvent the defendant’s Miranda rights and because there were no curative measures to ensure that the defendant was not misled with regard to his rights prior to his second confession, Capers’ waiver of his Miranda rights was invalid. The district court, therefore, properly suppressed his post-warning confession.
CONCLUSION
For the foregoing reasons, we AFFIRM the district court’s decision to suppress the defendant’s post -Miranda statements.

. The Supreme Court noted a police officer’s testimony at trial that the two-step strategy was promoted by his department, as well as by a national police training organization and was corroborated by a manual from the Police Law Institute, which provided instruction on the technique. Seibert, 542 U.S. at 609-10, 124 S.Ct. 2601 (plurality opinion).

. Because we concluded that the Seibert approach was inapplicable in Carter, we did not reach the issue of whether the police undertook any curative measures such that the suspect “would understand the import and effect of the Miranda warning and of the Miranda waiver.” Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring).

. In an unpublished Order and Judgment the Tenth Circuit, while declining to endorse either Kennedy’s concurrence or the Seibert plurality opinion as the holding of Seibert, explained in United States v. Crisp, 371 Fed.Appx. 925, 932 (10th Cir.2010), that the defendant's argument that his pre-warning statement was the product of a deliberate two-step interrogation was unavailing because no coercion was evident in either the surrounding circumstances or the content of the questioning, the pre-arrest statement "occurred after the parties had bantered about the pursuit and in response to a question about the marijuana use” of the defendant's female companion, and "the pre-Miranda statements also were unrelated to the post-Miranda statements regarding cocaine base.”

. We note that in light of the district court's conclusion that “Justice Kennedy’s concurrence ... cannot reasonably be taken to be the 'law of the land,’ ” it likely did not avail itself of a number of opinions by our sister circuits, which have been instructive in our analysis, advising trial courts how to gauge deliberateness under Justice Kennedy's Seibert concurrence. See Street, 472 F.3d at 1312 (11th Cir.2006); Courtney, 463 F.3d at 338 (5th Cir.2006); Williams, 435 F.3d at 1157 (9th Cir.2006); Kiam, 432 F.3d at 532 (3d Cir.2006); Hernandez-Hernandez, 384 F.3d at 566 (8th Cir.2004). Indeed it appears as though the district court thought that the Kennedy test required it to analyze only the statements of the offending officer, without reference to any other facts, possibly contradictory to the statements of the officer, that appeared on the record.

. The dissent argues that under the test outlined above “in almost all cases where a prewarning confession is suppressed due to a violation of the suspect’s Miranda rights, a subsequent post-warning confession will also be suppressed because the interrogating officer will be unable to articulate a 'legitimate' reason for not advising the suspect of his or her Miranda rights prior to the initial interrogation.” Dissent at 493. This conclusion also misreads our reasoning. To the contrary, there be will many occasions where the totality of the circumstances surrounding the two interrogations leads to the conclusion that a two-step interrogation was the product of a "rookie mistake,” resulted from poor communication among investigating officers, or occurred when an experienced officer suffered a momentary lapse in judgment. What will require higher scrutiny are situations where, as here, an experienced officer conducts both interrogations, and the reasons proffered for not initially Mirandizing a suspect are not only questionable but also inherently lack credibility in light of the totality of the circumstances.

. Consideration of whether or not curative measures were taken is an inquiry separate and apart from determining deliberateness. When analyzing deliberateness, however, courts may consider an experienced officer’s failure to warn a suspect that an earlier admission, known to the interrogating officer, is inadmissible. Indeed such an omission on the part of the interrogating officer is probative of a "calculated” plan to subvert Miranda.