19 A.3d 952

**Juanita ROBINSON**

v.

**STATE of Maryland.**

**No. 14, Sept. Term, 2010.**

Court of Appeals of Maryland.

May 6, 2011.

Michael R. Braudes, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Carrie J. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

In the Circuit Court for Baltimore City, a jury convicted Juanita Robinson, Petitioner, of first degree murder and related offenses, including use of a handgun in the commission of a crime of violence. The State's evidence, which was sufficient to establish that she committed those offenses on March 31, 2007, included testimony about three statements that Petitioner gave to investigating officers. The Circuit Court denied

Petitioner's pretrial motion for suppression of those statements, and that ruling was affirmed by the Court of Special Appeals in an unreported opinion. Petitioner then filed a petition for writ of certiorari in which she presented two questions for our review:

1. DID COURTS BELOW ERR IN HOLDING THAT PETITIONER WAS NOT IN "CUSTODY" FOR PURPOSES OF THE RULES OF *MIRANDA V. ARIZONA* [, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] WHERE PETITIONER, SUSPECTED IN A MURDER, WAS PLACED IN [A] POLICE SQUAD CAR WITH BAGS ON HER HANDS TO PRESERVE EVIDENCE, AND SUBSEQUENTLY PLACED FOR SEVERAL HOURS IN A "HOLDING CELL"?

2. DID THE TRIAL COURT ERR IN ITS RESPONSES TO TWO NOTES FROM THE JURY IN A MANNER WHICH INTERFERED WITH THE JURY'S AUTHORITY TO DRAW REASONABLE AND EXCULPATORY INFERENCES FROM THE EVIDENCE?

According to the State, Petitioner's questions should be rephrased as follows:

1. DID THE SUPPRESSION COURT CORRECTLY CONCLUDE THAT ROBINSON WAS NOT IN CUSTODY FOR PURPOSES OF MIRANDA WHEN SHE MADE HER FIRST TWO STATEMENTS TO POLICE AND, REGARDLESS, TO THE EXTENT ANY ERROR OCCURRED, WAS IT HARMLESS IN LIGHT OF ROBINSON'S LATER STATEMENT MADE AFTER SHE WAS ADVISED OF AND WAIVED HER RIGHTS UNDER MIRANDA?

2. SHOULD THIS COURT REFUSE TO DISTURB THE COURT OF SPECIAL APPEALS' DECISION TO DECLINE TO REVIEW FOR PLAIN ERROR THE TRIAL COURT'S ANSWERS TO TWO NOTES FROM THE JURY?

For the reasons that follow, we shall answer "yes" to Petitioner's first question and "no" to the State's first ques-

tion. As a result of these answers, the parties' second questions are moot. We shall therefore reverse the judgment of the Court of Special Appeals, and direct that Court to (1) vacate the judgments of the Circuit Court for Baltimore City, and (2) remand for a new trial during which only the first of Petitioner's three statements will be admissible during the State's case-in-chief.

## Background

The opinion of the Court of Special Appeals included the following factual summary:

On March 31, 2007, police were called to 6622 Knottwood Court in Baltimore City in response to a shooting. Upon arrival at 2:34 p.m., officers found Andre McBride near death. McBride had been shot three times: once in the back of the head, once in the back of the shoulder, and once in the front of the thigh. McBride was taken to the hospital where he was pronounced dead.

Robinson made three separate statements to police about the shooting. The first was taken at the scene of the shooting, the second was taken the same day at the homicide unit, and the third was taken approximately five weeks after the shooting at the homicide unit following Robinson's arrest.

The first statement was taken by Officer Andre Godfrey. Officer Godfrey was called to the scene of the shooting. Upon arrival, Officer Godfrey saw Robinson attempting to enter a white van. Inside the van were three individuals, who were later determined to be Robinson's mother, sister, and a male companion of Robinson's mother. Because Officer Godfrey was not certain of what, if any, role these individuals had in the shooting, he detained all four individuals at the scene.

Officer Godfrey then asked them if they knew McBride. Robinson responded that McBride was her boyfriend, that they had been arguing all day, "and then it moved upstairs and that's when she heard gunshots." This untaped statement was taken without any pressure or force from officer

Godfrey, while Robinson was in her mother's van, surrounded by family.

After Robinson finished this statement, Officer Godfrey's supervisors instructed him to place bags on Robinson's hands and place her in a patrol car. These supervisors also informed Robinson and her family that there was an investigation going on and instructed them not to leave.

After being placed in the patrol car, with her hands and feet uncuffed, Robinson was transported to the police facility. Once there, Robinson was photographed and her hands were tested for gunshot residue. She was then placed in a holding cell. Her mother and sister, who were also transported to the police facility, were placed in an interview room.

Later that evening, Robinson was moved from the holding cell to an interview room. At that time, she was questioned by Detective Joseph Phelps and Detective Sergeant Kelvin Sewell. Robinson gave a taped statement in which she admitted to being with McBride in the house at the time of the shooting, that they had been arguing throughout the day, and that their relationship had become rocky, marked by constant arguments. Robinson, however, insisted that she did not shoot McBride. She stated that the shooting occurred as she was attempting to leave the home because of an argument. Robinson further stated that she opened the front door and an unknown person fired shots into the open door. She insisted that these were the shots that struck and killed McBride. After completion of her statement, Robinson was allowed to leave without any conditions and driven to her mother's home.

Robinson's third statement was taken approximately five weeks after her first two statements. This statement was taken after she had been arrested. Robinson was advised of, and waived, her *Miranda* rights. In this statement, Robinson told Detective Phelps that what she had said previously, in the recorded statement, was true. Detective Phelps could not recall what specifics he restated to Robinson when he asked her about the prior statement. He did

however, testify that he had summarized some of the details and Robinson agreed to them. Robinson's third statement was similar to the first two statements.

Prior to trial, defense counsel made motions to suppress Robinson's first two statements. Those motions were based on the argument that her constitutional rights had been violated because she was in custody and not informed of her *Miranda* rights.

The court first heard testimony regarding the second statement. The hearings were held in this order because Officer Godfrey[, the officer who had taken the initial statement at the scene,] was not available until after the completion of the initial suppression hearing. After hearing testimony, the suppression court rejected Robinson's motion. The court found:

> And she testified that, in fact, she knew she didn't have to talk to the police and she knew that she had a right to a lawyer.
>
> I think from the totality of the facts and circumstances, I am satisfied, in fact, well, I'm satisfied by clear and convincing evidence that, in fact, the Defendant's statement was voluntary, wasn't induced, there was no threat, force. And I'm also satisfied by clear and convincing evidence that the March 31st statement was not a custodial interrogation that would have required *Miranda* Because after all, she did leave.... And it was a repetition of what she had said earlier and she never asked to leave, she never asked them to stop, and she was free to leave and was free to do anything she wanted for a good month after that until she was formally charged.

> \* \* \*

> ... she said she wanted to talk to police on both occasions.

> \* \* \*

> So I deny your motion to suppress all statements made in this case....

During the afternoon of the first day of trial, when Officer Godfrey became available, the court reopened the suppression hearing regarding Robinson's first statement. The court again, for similar reasons, denied Robinson's motion to suppress.

*Robinson v. State,* No. 667, September, 2008, filed November 19, 2009, slip opinion pp. 1–5.

Petitioner made her post-arrest statement after she was arrested pursuant to a warrant issued by a District Court Commissioner on the basis of an Application for Statement of Charges filed by Detective Phelps which, in pertinent part, stated:

I, the undersigned, apply for statement of charges and a summons or warrant which may lead to the arrest of the above named Defendant because on or about 31 March 2007 at 6622 Knottwood Ct., the above named Defendant on 31 March 2007 @ 1445 hours Dispatcher # 87 contacted the Homicide Office and advised that 4B24 was on the scene of the shooting at 6622 Knottwood Ct. and was requesting Homicide to respond. Investigators responded to the scene.

Investigation revealed that on 31 March 2007 at 1432 hours, Northeaster District Officers were dispatched to 6622 Knottwood Ct. on a call for a shooting. Upon arrival, Officers found the victim, Andre McBribe, M/B 21 yrs. lying inside the doorway of that location being attended to by Fire Department personnel. The victim had sustained at least one gunshot wound to the head, Medic # 18 transported the victim to Sinai Hospital where he was pronounced dead by Dr. Genute at 1539 hours that date. The crime scene was secured and proper notifications were made. A search and seizure warrant was obtained and the crime scene at 6622 Knottwood Ct. was processed.

The victims girlfriend, Juanita Robinson, F/B 27 yrs., from 6622 Knottwood Ct. was transported from the scene to the Crime Lab processing bay where a GSR (Gun Shot Residue) Test was performed. Ms. Robinson was then transported to the Homicide Office for interview. In a tape

statement Ms. Robinson advised that on 31 March 2007, she and the victim were involved in an ongoing dispute. Ms. Robinson advised that at some point she had attempted to open her front door and exit the dwelling, however, the victim pushed Ms. Robinson to the kitchen floor and closed the door. At that point Ms. Robinson heard a gunshot, got up and ran into the living room when she heard additional gunshots. Ms. Robinson returned to the kitchen and found the victim lying in the doorway with his head resting on interior steps. Ms. Robinson advised that she then left the dwelling and asked the neighbors for help.

On 1 April 2007 an autopsy was performed on the victim at the OCME by Drs. Mary Ripple and Jonrika Malone. The post mortem exam revealed that the victim was shot 3 times. Once to the back of the head, once to the back and once to the front of the left thigh. The doctors ruled that the cause and manner of death was Homicide by Shooting.

**During the course of the investigation, witnesses were interviewed and advised that no one else was seen in the court except for Ms. Robinson who was calling for someone to call for help. Additionally, on 13 April 2007 the results of the GSR Test were provided by the Trace Unit. The GSR Test for Ms. Robinson was positive, meaning that her hands were immediately adjacent to a discharging firearm or were themselves used to fire the firearm.**

(Emphasis supplied).

### Discussion

The following standard of review is applicable to the rulings of the suppression hearing court:

> " '[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion,' " here, the *State. Owens v. State,* 399 Md. 388, 403, 924 A.2d 1072, 1080 (2007) (*quoting State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439, 444 (2003)), cert. denied, 552 U.S. 1144, 128 S.Ct. 1064, 169 L.Ed.2d 813 (2008). "We defer to the motions court's factual findings

and uphold them unless they are shown to be clearly erroneous." *State v. Luckett,* 413 Md. 360, 375 n. 3, 993 A.2d 25, 33 n. 3 (2010). "We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case." *Id.,* 993 A.2d at 33 n. 3 (quotation marks and citation omitted).

*Lee v. State,* 418 Md. 136, 148–49, 12 A.3d 1238, 1245–46 (2011).

While affirming the rulings of the suppression hearing court, the Court of Special Appeals stated:

A reasonable person in Robinson's position would have believed that she was not in custody for at least two reasons: [ (1) ] Robinson's status in the investigation and what occurred after she completed her statements. At no time during the day did any officer inform Robinson that she was a suspect. Officers informed her that there was an investigation and they wanted to know what happened. In all the information reports regarding Robinson on the day of the shooting, she was listed as a witness. [ (2) ]Additionally, at the completion of the interview, Robinson was driven to her mother's residence. She was free to do as she pleased until she was arrested approximately five weeks later.

We agree with the holding that Petitioner was not entitled to suppression of the statement that she made to Officer Godfrey at the scene of the shooting. We conclude, however, that the State should have been prohibited from introducing into evidence during its case-in-chief the statements Petitioner subsequently gave to Detectives Phelps and Sewell.

## I.

■ Petitioner first argues (in the words of her brief):

Petitioner was in custody for *Miranda* purposes when she made her initial bare-bones statement to Officer Godfrey, because Godfrey and his superiors all communicated to her that she was not free to leave, bagged her hands, and

transferred her from the refuge of her family's vehicle to the far more coercive environment of a patrol car.

The suppression hearing court and the Court of Special Appeals rejected this argument. So do we. When Petitioner was originally questioned at the scene, she was a potential witness. The officers attempting to obtain information about what had occurred were entitled to (1) require that potential witnesses remain at the scene, and (2) question those witnesses without advising them of their *Miranda* rights. The record shows that Petitioner's freedom of movement was not restricted beyond what was required in order to take her statement, which she gave to Officer Godfrey while she and her family members were seated in her mother's van.

■ Petitioner next argues (in the words of her brief):

... the custodial pressure increased exponentially by the time she provided the more detailed and inculpatory account of her mutually destructive relationship with McBride, as by that point she had been separated more definitively from her family, taken to a police facility, photographed, had her hands swabbed for evidence of murder, been placed for hours in a holding cell, and then taken to an interview room, where she faced two experienced detectives. She could not conceivably have felt free to terminate the interrogation and leave. No reasonable person could have done so.

The State argues, however, that under the "totality of the circumstances," the Circuit Court and the Court of Special Appeals were correct in their conclusions that Detectives Phelps and Sewell were not required to advise Petitioner of her *Miranda* rights when they questioned her in an interview room at the Homicide Unit. In the words of the State's brief:

Robinson's freedom of movement was never restricted to the "degree associated with a formal arrest." *Owens,* 399 Md. at 428 [924 A.2d 1072] (quoting *California v. Beheler,* 463 U.S. 1121, 1125 [103 S.Ct. 3517, 77 L.Ed.2d 1275] (1983)). She was not the only person transported to the Homicide Unit for questioning as a potential witness; there is no evidence that she was placed in handcuffs or leg irons;

she was allowed to use the bathroom and get a drink of water; she was questioned as a witness, not a suspect; and after the interview, she was taken to her mother's house, and was not arrested until over a month later. In light of those circumstances, *Miranda* warnings were not required.

\* \* \*

In *Abeokuto v. State*, 391 Md. 289, [893 A.2d 1018] (2006), in fact, this Court held that appellant was not in custody for purposes of *Miranda*, even though he was questioned and then held in a "small locked room" of one police station for two and a half hours before police transported him to another police station where he waited for three hours before police questioned him again. This Court concluded that, "while some circumstances [of appellant's questioning] hint at restraint or coercive elements," The totality of the circumstances did not rise to the level of custody for purposes of *Miranda*. *Abeokuto*, 391 Md. at 332[, 893 A.2d at 1043]. This Court added: "[t]hat the questioning occurred in a police station is not determinative of whether a custodial interrogation occurred." *Id.*

The fact that Robinson had bags placed on her hands in advance of a test for the presence of gunshot residue is likewise not dispositive of the issue of *Miranda* custody. The Fourth Circuit considered this very issue in *United States v. Jamison*, 509 F.3d 623, 629–31 (4th Cir.2007), and concluded that, while a reasonable person "might find it odd" that bags were placed on his or her hands, such curiosity does not "lead to an inference that a reasonable person would consequently feel unable to refuse police questioning." *Id.* at 630–31. Even assuming, *arguendo*, that bagging someone's hands would suggest to a reasonable person that he or she was a suspect in the crime being investigated, that is wholly different than conveying the message that the person is under arrest.

Moreover, other circumstances would have led a reasonable person in Robinson's position to believe that she was free to terminate police contact. Robinson was not at the Homicide Unit alone; several people present at the scene

were taken to the police station for questioning.  She was given water and permitted to use the restroom while she waited for Detective Phelps.  Detective Phelps never "accuse[d] [her] of doing anything wrong[,]" or otherwise indicated that she was being treated as a suspect.  Finally, she was driven home after the interview, and was not arrested until over a month later.  All of these factors would suggest to a reasonable person that he or she is not under arrest, and is free to terminate the encounter with police.  *See Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (Supreme Court considered that respondent left police station "without hindrance" in concluding that he was not in *Miranda* custody); *Owens,* 399 Md. at 429[, 924 A.2d at 1095–96] ("whether the defendant left freely, was detained or arrested," can assist in determining whether defendant would have felt free to discontinue the questioning).

*        *        *

Under the totality of circumstances, a reasonable person in Robinson's position would not have felt pressure sufficient to impair the free exercise of his or her right against self-compulsion. At no point during the evening was there a restriction upon Robinson's freedom of movement to the degree associated with formal arrest.  As such, *Miranda* warnings were not required.  The lower court correctly denied Robinson's motion to suppress.

We hold that Petitioner's second statement was the product of a custodial interrogation that did not comply with the requirements of *Miranda.*  This holding is based upon our independent, constitutional appraisal of the record, which clearly shows that Petitioner was subjected to custodial interrogation.

Immediately after Petitioner made her initial statement to Officer Godfrey, she was placed in the back of a marked police car, where Tyvek bags were placed over her hands.[1]  At that

---

1.  Tyvek bags are used by police to preserve gun powder residue that may remain on the hands of a person who has fired a gun.

same time, police informed Petitioner's family members that the investigation was "ongoing" and that they should remain at the scene. Rather than ask Petitioner any additional questions at the scene, the investigating officers transported her to the Homicide Unit, where she was photographed and her hands were tested for gunshot residue. Petitioner was then placed in a holding cell, where she remained for five hours. At approximately 10:15 p.m., nearly six full hours after she had been transported to the Homicide Unit, she was transferred to an interview room where she was questioned for approximately two hours by Detectives Phelps and Sewell.

■ Petitioner was never advised of her *Miranda* rights until May 7, 2007, on which date she was formally arrested. She had been at the Homicide Unit for over eight hours when she gave the audio-taped statement that was introduced into evidence during the State's case-in-chief. After she gave the audio-taped statement, Petitioner was told for the first time that she was free to leave the police station, and she was driven by a police officer to her mother's home. Under these circumstances, it is of no consequence that Petitioner was released and driven to her mother's house *after* she had given a statement that had been obtained in violation of *Miranda.*

Based upon the undisputed sequence of events that preceded Petitioner's transfer from the holding cell to the interview room, there is no merit in the State's argument that a reasonable person who had been subjected to the same restraints would understand that he or she was a "potential witness who was free to leave" when Detectives Phelps and Sewell entered the holding cell.[2]

■ The State argues in the alternative that, because Petitioner waived her rights and gave a voluntary statement when

---

2. During his testimony, Detective Phelps suggested that the door to the cell was most likely not locked. Whether the cell door was or was not locked is of little, if any, consequence. What is of consequence is the fact that, when Petitioner's mother and sister were transported to the Homicide Unit, they were escorted into an "interview room" rather than a "holding cell."

she was formally arrested, Petitioner's *Mirandized* affirmation of the earlier *un-Mirandized* statements renders "harmless beyond a reasonable doubt" any impropriety in the admission of the audio-taped statement. In the words of the State's brief:

> The Supreme Court has held that absent coercive or improper actions on the part of the interrogating officers, "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible." *Oregon v. Elstad,* 470 U.S. 298, 310–311 [105 S.Ct. 1285, 84 L.Ed.2d 222] (1985) In this case, there is no allegation of any police misconduct that would render Robinson's warned statement inadmissible.

> *Missouri v. Seibert,* 542 U.S. 600 [124 S.Ct. 2601, 159 L.Ed.2d 643] (2004), in which the Supreme Court held inadmissible statements made after *Miranda* warnings were delivered in the middle of an on-going interrogation, is inapposite. In that case, the police employed a "question first" strategy, meaning that the interrogators intentionally withheld *Miranda* warnings with the express purpose of eliciting a confession, then advising Seibert of her rights under *Miranda* and using her previous, unwarned statement to convince Seibert to repeat her confession. *Id.* at 604, 610–11 [124 S.Ct. 2601]. Under those circumstances, the Court concluded, the appropriate inquiry is whether "the warnings could function 'effectively' as *Miranda* requires." *Id.* In finding that the warnings were ineffective in Seibert's case, the Court held that a reasonable person would have regarded the further questioning (post-*Miranda*) as "a mere continuation of the earlier questions[,]" in which "it would have been unnatural to refuse to repeat at the second stage what had been said before." *Id.* at 616–17 [124 S.Ct. 2601].

*      *      *

In this case, there is no claim that police employed the "question first" strategy. To the contrary, over five weeks passed between Robinson's first interview with Detective Phelps and her arrest and subsequent second interview.

Even though Detective Phelps made references to Robinson's earlier statement, no reasonable person would have believed it "unnatural to refuse to repeat" what Robinson had said over a month earlier. *Seibert,* 542 U.S. at 617 [124 S.Ct. 2601]. Rather, the facts here are closer to those in *Elstad,* where the Court found that "a reasonable person in the suspect's shoes could have seen the [second interrogation] as a new and distinct experience," and thus the *Miranda* warnings "could have made sense as presenting a genuine choice whether to follow up" on the earlier statement. *Seibert,* 542 U.S. at 615–16 [124 S.Ct. 2601].

Furthermore, Robinson did not confess during the March interview. Thus, there was no danger that Robinson believed that the "cat was out of the bag," and refusing to speak further was futile. In *Seibert,* the Supreme Court noted that one of the reasons the "question-first" strategy does not satisfy the requirements of *Miranda* is that "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think that he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." 542 U.S. at 613 [124 S.Ct. 2601]. That is a far cry from what happened in this case.

A reasonable person in Robinson's position on May 7, 2007[,] would have understood her second interview with Detective Phelps as a new and distinct experience, and would have understood the *Miranda* warnings as offering a choice whether to follow up on her statement from over five weeks earlier. Therefore, to the extent properly before this Court, even if Robinson's taped statement was erroneously admitted, that error was harmless because Robinson expressly adopted the taped statement five weeks later, after being advised of, and waving, her rights under *Miranda.*

■■■ We agree with the State that *Elstad* does indeed hold that, " . . . absent coercive or improper actions on the part of the interrogating officers, 'a careful and thorough administration of *Miranda* warnings serves to cure the condition that

rendered the unwarned statement inadmissible.' " *Oregon v. Elstad, supra,* 470 U.S. at 310–11, 105 S.Ct. at 1293–94. We are persuaded, however, that the decision to employ a "question first, warn later" strategy is precisely the kind of "improper actions on the part of the interrogating officers" that cannot be "cured" by subsequent administration of *Miranda* warnings.

From our independent, constitutional appraisal of the interrogators' conduct, we reject the State's argument that these experienced detectives did not employ a "question first, warn later" strategy during Petitioner's custodial interrogation in the holding cell. It is significant to us that, as noted by the Court of Special Appeals, "[i]n [her post-arrest] statement, [Petitioner] told Detective Phelps that what she had said previously, in the recorded statement, was true. Detective Phelps could not recall what specifics he restated to [Petitioner] when he asked her about the prior statement. He did however, testify that he had summarized some of the details and [Petitioner] agreed to them." If the detectives had not employed the "question first, warn later" strategy when they interrogated Petitioner in the holding cell, their post-arrest interrogation of Petitioner would certainly have included questions about whether (in the words of the Application for Statement of Charges) "her hands were immediately adjacent to a discharging firearm or were themselves used to fire the firearm," and would certainly not have concluded as soon as she (in the words of the Court of Special Appeals) "told Detective Phelps that what she had said previously, in the recorded statement, was true." Under theses circumstances, the "question first, warn later" strategy that was employed in the holding cell constituted the precise kind of "improper tactics in obtaining the [audio-taped] statement" that render Petitioner's post-arrest statement inadmissible under *Oregon v. Elstad.*

Moreover, Petitioner's post-arrest statement is clearly inadmissible under *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). Although this Court has not

previously applied that decision, Judge Barbera did so while she served on the Court of Special Appeals. Writing for that Court in *Cooper v. State*, 163 Md.App. 70, 877 A.2d 1095 (2005), Judge Barbera stated:

> *Elstad*, it must be remembered, dealt only with "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will[.]" *Id.* at 309 [105 S.Ct. 1285]. The Court emphasized "that, *absent deliberately coercive or improper tactics in obtaining the initial statement*, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Id.* at 314 [105 S.Ct. 1285] (emphasis added).

\* \* \*

Nearly 20 years after *Elstad*, the Supreme Court was presented in *Seibert* with the situation hypothesized in *Elstad*: the failure of police to administer *Miranda* warnings under " 'circumstances calculated to undermine the suspect's ability to exercise his free will.' " 124 S.Ct. at 2610 n. 4 (quoting *Elstad*, 470 U.S. at 309 [105 S.Ct. 1285] ). The *Seibert* Court held that the two-step interrogation tactic used by the police to obtain a confession from Patrice Seibert violated *Miranda*. *Id.* at 2605–07.

Seibert had a twelve-year-old son, Jonathan, who suffered from cerebral palsy. When Jonathan died, Seibert feared that neglect charges would be filed against her. She, together with two of her teenage sons and two friends, devised a plan to conceal Jonathan's death by burning the family's mobile home, with Jonathan's body inside. To make it appear that Jonathan was not alone when he died, the plan entailed leaving Donald Rector, a mentally ill teenager who was living with the family, in the mobile home when it was set ablaze. Seibert's two sons set fire to the mobile home and Rector died inside the burning structure. *Id.* at 2605–06.

Five days later, Seibert was arrested for the death of Rector. The arresting officer was instructed by Officer

Richard Hanrahan not to administer *Miranda* warnings to Seibert. She was transported to the police station and was questioned by the interrogating officer for 30 to 40 minutes, who repeatedly stated to Seibert that "Donald [Rector] was also to die in his sleep." *Id.* at 2606. Seibert finally admitted that she knew that Rector was meant to die in the fire. *Id.*

Seibert was given a 20–minute break during which the interrogating officer turned on a tape recorder, informed her of her *Miranda* rights, and obtained from her a signed waiver of those rights. The officer resumed questioning Seibert by first confronting her with her pre-*Miranda* statements. The officer then obtained a full confession from Seibert. *Id.*

Seibert was charged with first degree murder for her part in Rector's death, and subsequently sought to have her pre- and post-*Miranda* statements suppressed. "At the suppression hearing, Officer Hanrahan testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique" of question first until a confession is obtained, then advise the suspect of his or her rights, and then repeat the original question until the answer that has already been provided is repeated. *Id.*

The trial court suppressed Seibert's pre-warning statement, but allowed her post-warning statements to be admitted. On appeal, the intermediate appellate court, following *Elstad,* affirmed. The Supreme Court of Missouri reversed. *Id.*

The Supreme Court affirmed the Missouri court. The Supreme Court's decision produced four opinions: the plurality opinion (Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ); two concurring opinions (Breyer, J.), (Kennedy, J.); and a dissenting opinion (O'Connor, J., joined by Rehnquist, CJ, Scalia, and Thomas, JJ). *Id.* at 2601–02.

\* \* \*

The plurality fashioned a multi-factored test for use in deciding whether statements made during continuing inter-

rogations are admissible in light of belated *Miranda* warnings. The plurality's test looks to several factors "that bear on whether *Miranda* warnings delivered midstream could ... accomplish their object." *Id.* These factors include:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.*

Applying that test to the circumstances of *Seibert's* two-step interrogation, the plurality concluded: "These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.* at 2613.

Justice Kennedy wrote separately, supplying the vote necessary to make a majority. In his concurrence, Justice Kennedy eschewed the plurality's multi-factor test, which would apply to both intentional and unintentional two-stage interrogations, as a test that "cuts too broadly." *Id.* at 2616. Justice Kennedy set forth "a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.*

*Id.* at 87–91, 877 A.2d at 1105–07.

After explaining why Justice Kennedy's opinion represents the "holding" of the *Seibert* Court,[3] Judge Barbera provided the following summary of that opinion:

---

**3.** *Cooper* cites to several cases in which the United States Supreme Court stated that, when a majority of the Court does not agree upon the rationale for the decision, the "holding" in that case is the opinion that sets forth the "narrowest grounds" on which the case is decided. *Id.* at 91, 877 A.2d at 1107.

Justice Kennedy made clear in his concurrence that "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." *Seibert,* 124 S.Ct. at 2616. But, "[i]f the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* Such curative measures, Justice Kennedy explained, "should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* He cited, as examples of curative measures, "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning. . . ." *Id.* A break of this sort "may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* Justice Kennedy posited, as a possible alternative curative measure, "an additional warning that explains the likely inadmissibility of the prewarning custodial statement. . . ." *Id.*

*Id.* at 92, 877 A.2d at 1108.

In the case at bar, Petitioner made her audio-taped statement on March 31st and her post-arrest statement on May 7th. This "break in time," however, was certainly not "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and the *Miranda* waiver," and therefore did not constitute a "substantial break in circumstances." As is shown by the fact that the investigators asked no post-arrest questions pertaining to the GSR Test results, Petitioner's post-arrest interrogation simply had not "taken a new turn."

As noted above, Petitioner's post-arrest statement was made after she had been arrested under the authority of an arrest warrant. Maryland Rule 4–212(e), in pertinent part, provides that a defendant arrested on an arrest warrant "shall be taken before a judicial officer of the District Court without

unnecessary delay and in no event later than 24 hours after arrest." When Petitioner was arrested, however, she was transported to the Homicide Unit, where Detective Phelps merely "summarized" her earlier statements, and terminated the interrogation as soon as Petitioner "agreed to them." We therefore hold that, under Justice Kennedy's "narrower test applicable only in the infrequent case," Petitioner's post-arrest statement does not operate to attenuate the *Miranda* violation that renders her audio-taped statement inadmissible during the State's case-in-chief.

Every one of the other relevant *Seibert* factors reaffirm our conclusion that the post-arrest warnings were totally ineffective in the case at bar. Those factors include:

**The completeness and detail of the questions and answers during the Petitioner's custodial interrogation:** The completeness and detail of the questions and answers during Petitioner's interview room interrogation were substantial. As noted above, this interrogation occurred after Petitioner had been confined to a holding cell, included a two hour "pre-interview" and concluded with an audio-taped statement.

**The timing and setting of the interrogations:** Petitioner's audio-taped statement and post-arrest statement were both made in the Homicide Unit.

**The continuity of police personnel:** It was Detective Phelps who (1) transferred Petitioner from the holding cell to the interview room, where he interrogated her without advising her of her *Miranda* rights, and (2) obtained Petitioner's post-arrest statement after advising her of her *Miranda* rights.

**The degree to which the interrogator's questions treated the subsequent interrogation as continuous with the prior interrogation:** It is clear that Detective Phelps treated Petitioner's post-arrest statement as a continuation of her audio-taped statement. As noted above, Detective Phelps was unable to recall what details of the audio-taped statement he "summarized" for Petitioner, and he terminat-

ed the post-arrest interrogation when he was satisfied with her "what I said on tape was true" response.

**The overlapping content of the two statements:** The "incorporation by reference" of the "summarized" audiotaped statement makes it clear that the content of the two statements was identical. After she was arrested and—for the first time—advised of her *Miranda* rights, Petitioner was simply asked to confirm that her *unMirandized* audiotaped statement was true. As Justice Souter stated in *Seibert*, "[t]hese circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspects's shoes would not have understood them to convey a message that she retained a choice a about continuing to talk." 541 [542] U.S. at 617, 124 S.Ct at 2613.

For the reasons stated above, of the statements at issue in the case at bar, we hold that only Petitioner's statement to Officer Godfrey was admissible during the State's case-in-chief. We therefore hold that Petitioner is entitled to a new trial at which the State's case-in-chief shall not include evidence of any statement made by Petitioner (1) during the interrogation that occurred after she was transferred from the holding cell to the interview room, and (2) during her post-arrest interrogation. As a result of these holdings, the parties' second questions are moot.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND TO THAT COURT FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE COURT OF SPE-CIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**