24 A.3d 703

**Dedrick Tyrone WILKERSON**

v.

**STATE of Maryland.**

**No. 107, Sept. Term, 2010.**

Court of Appeals of Maryland.

July 14, 2011.

Reconsideration Denied Aug. 11, 2011.

Kelly Knepper–Stephens (The George Washington University Jacob Burns Community Legal Clinics, Washington, D.C.), on brief, for petitioner/cross-respondent.

Gary E. O'Connor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

We granted a petition and conditional cross-petition for writ of certiorari to consider application of the Supreme Court's 2004 decision in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), which dealt with "two-step" or "question-first" interrogation tactics, to the circumstances of this case. *See generally* Eric English, *You Have the Right to Remain Silent. Now Please Repeat Your Confession:* Missouri v. Seibert *and the Court's Attempt to Put an End to the Question–First Technique*, 33 PEPP. L.REV. 423 (2006). Regrettably, we are unable on this record to confront head-on the merits of the questions presented in the petition and cross-petition; rather, we shall direct a limited remand to the Circuit Court for Howard County for further proceedings.

Dedrick Tyrone Wilkerson ("Wilkerson") challenges the Court of Special Appeals's judgment, as explained in its unreported opinion, that the trial court did not err in denying his motion to suppress his statements made after a full *Miranda* waiver. The intermediate appellate court reasoned that the interrogating officers did not engage in *Seibert's* prohibited two-step or pre-advisement warning question-first tactics. The State, in its conditional cross-petition, challenges the holding of the panel of the intermediate appellate court that Wilkerson preserved his *Seibert* argument for appellate review. For reasons to be explained more fully *infra*, because we believe that justice will be served best by permitting further proceedings, we hold that the appropriate disposition of this case is a limited remand to the Circuit Court so that the record may be developed more fully on the possible *Seibert* contention, and the trial court may make the appropriate findings.

## FACTS AND LEGAL PROCEEDINGS

On the evening of 18 October 2007, Lori Lefayt ("Lefayt") sought medical treatment at the Howard County General Hospital, reporting that she had been raped earlier that night. Lefayt testified at trial[1] that earlier on the evening of 18 October, she was attempting to withdraw money from an ATM machine at the Wilde Lake Village Center in Columbia when two young men—one of whom she identified later to police as Wilkerson—approached her and asked for a cigarette. After obliging the request, she contended the other man—later identified as Wilkerson's brother—left the area. Lefayt testified that she "told [Wilkerson] that [she] needed money because [she] was ailing, [she] was withdrawing from a [drug] habit [she] had during that time." Lefayt continued that, unable to withdraw money from the Wilde Lake ATM, she walked with Wilkerson to find another ATM. Apparently, the route the two took to get to that second ATM led them through a field area between the Wilde Lake High School and Middle School.

According to Lefayt, Wilkerson asked to borrow her cell phone battery. She claims that, as she retrieved the battery, Wilkerson attacked her, throwing her to the ground, pushing her face into the ground, and putting his knee on her back. She claimed that she could not scream because Wilkerson choked and threatened her. Lefayt recalled that she lost consciousness for a period of time, regaining consciousness as Wilkerson was withdrawing his penis from her vagina.[2] Lefayt testified that she remained on the ground for approximately twenty minutes before returning home and thence to the hospital.

---

1. Although the present appeal focuses on the suppression hearing, we include here, for background purposes, some factual testimony gleaned from the trial. The trial testimony supplies context, but does not figure in our analysis of the questions presented on appeal.

2. Laboratory testing of vaginal swabs taken from Lefayt at the hospital linked Wilkerson to having had sex with Lefayt.

Wilkerson testified at trial to a different rendition of his encounter with Lefayt on 18 October 2007. Specifically, Wilkerson testified that Lefayt asked him if he had any drugs, to which he responded in the negative. Wilkerson testified further that Lefayt agreed to have sexual intercourse with him in exchange for him arranging to acquire drugs for her. According to Wilkerson, the pair then went behind a nearby restaurant where they engaged in sexual intercourse, after which he told Lefayt to wait there while he attempted to acquire some drugs. Unable to find drugs, Wilkerson claimed to have returned to the shopping center but, finding Lefayt gone, returned to his mother's home around 10:00 p.m. that evening.[3]

We now focus on the "facts" of particular relevance to the present posture of the case before us. At approximately 7:00 a.m. on 6 December 2007, Howard County Police officers executed search and seizure and arrest warrants at Wilkerson's home. Two police detectives—Detectives Denise Francis and Aaron Miller—interviewed Wilkerson in his home, after placing him in flex cuffs, for approximately twenty five minutes. The following is the sum and substance of the questioning that took place before *Miranda*[4] warnings were given and waived:

[DET. MILLER]: Detective Francis ha[s] a few questions for you, OK?

[WILKERSON]: Uh-huh.

[DET. FRANCIS]: Dedrick, I'm Detective Francis.

[WILKERSON]: How you doing.

[DET. FRANCIS]: Fine, how are you?

[WILKERSON]: That window open?

[DET. MILLER]: Naw, it's closed.

---

**3.** Apparently, Wilkerson, who was wearing an ankle monitor at the time because of an earlier offense, was "AWOL" from his mother's home.

**4.** *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[DET. FRANCIS]: No, it's closed. This is Detective Miller.

[DET. MILLER]: How you doing?

[DET. FRANCIS]: OK, um, today is, uh, [December] 6, 2007. Um, we are here at the, um, Wilkerson residence. We are at um, 10528 Crossfox Lane, Apartment B–2. OK, um, Dedrick, do you know why we're here?

[WILKERSON]: Uh-uh.

[DET. FRANCIS]: No? No idea?

[WILKERSON]: Uh-uh.

[DET. FRANCIS]: No, OK, um, we're here about something that happened um, a while back, up at the village center.

[WILKERSON]: (Inaudible)

[DET. FRANCIS]: Where you met somebody?

[WILKERSON]: And what happened?

[DET. FRANCIS]: Well, that's what we[']re here to talk about. . . .

[DET. FRANCIS]: Have you ever met somebody at the village center? A female.

[WILKERSON]: Uh-uh.

[DET. FRANCIS]: You don't remember meeting anybody up at the village center?

[WILKERSON]: Uh-uh.

[DET. MILLER]: Was in beginning of November?

[DET. FRANCIS]: Yeah.

[DET. MILLER]: Around the beginning of November?

[WILKERSON]: No, I've been on the box and locked up around that time.

[DET. FRANCIS]: OK.

[DET. MILLER]: When you say "the box" you mean the ankle bracelet?

[WILKERSON]: Yeah.

[DET. MILLER]: OK.

[DET. FRANCIS]: And that monitor's [sic] you, you can't, where can you go? Where are you allowed to go?

[WILKERSON]: No where [sic] unless I have permission from my mother and that she's going out with me.

[DET. FRANCIS]: So your mother has to be with you?

[WILKERSON]: Yeah.

[DET. FRANCIS]: OK, and where can, where can you go without your mother?

[WILKERSON]: Only places where I couldn't go with her, anywhere she, actually I go with her.

[DET. FRANCIS]: OK so.

[WILKERSON]: But the only time I went out with her is like for jobs, going out looking for job or whatever, putting job applications. Stuff like that.

[DET. MILLER]: So when you say you can go out, like, does your mom say you have to go out or [do you] have to call anybody?

[WILKERSON]: Yeah, I have to call.

[DET. MILLER]: OK, who do you call? What's the?

[WILKERSON]: My mother calls really. Ms. Lyles.

[DET. MILLER]: OK, what's the person's name?

[WILKERSON]: Ms. Lyles.

[DET. MILLER]: Ms. Lyles?

[WILKERSON]: Yeah (inaudible).

[DET. MILLER]: And then she'll I guess do something on the computer that lets you leave the house?

[WILKERSON]: Yeah, that's right.

[DET. FRANCIS]: Can I borrow your pen?

[DET. MILLER]: So you've been, you beginning of November, even the end of September you didn't go anywhere?

[WILKERSON]: End of September, I was locked up, 'cause it had been my birthday, after my birthday I got locked up, my birthday's September 15th.

[DET. FRANCIS]: What about October?

[WILKERSON]: October, January, February, March (inaudible)

[DET. FRANCIS]: You had that monitor on in October? When did you get the monitor?

[WILKERSON]: August, September.

[DET. FRANCIS]: In October?

[WILKERSON]: Yeah, I had on the box then too.

[DET. FRANCIS]: OK, well, how about around the middle of October?

[WILKERSON]: October.

[DET. FRANCIS]: Did you meet a girl up at the village center?

[WILKERSON]: Naw, I been on the box.

[DET. MILLER]: OK.

[WILKERSON]: 'Cause I been on the box for three, four and a half, five months.

[DET. FRANCIS]: OK, wha[t], what time do you have?

[DET. MILLER]: Right now, it's, uh, 7:06.

[DET. FRANCIS]: OK, six. OK, I'm going to read you um, your rights OK?

[WILKERSON]: Um-hum.

In his post-advisement statements to the detectives, Wilkerson denied being in the area where the alleged crime took place on 18 October 2007, explaining that because of his electronic monitoring, he would not have been allowed at the Wilde Lake Village Center at that time of the night. After being told that an ATM surveillance camera recorded him with Lefayt on the evening in question, Wilkerson denied consistently having any recollection of being at the Village Center that night. Further, Wilkerson told the detectives he was not familiar with anyone named Lori. Finally, Wilkerson denied having any recollection of engaging in sexual intercourse with Lafayt or any other female that night. Wilkerson was charged ultimately with first- and second-degree rape, first-degree assault, false-imprisonment, and reckless endangerment.

On 28 April 2008, the Circuit Court held a hearing on Wilkerson's motion to suppress Lafayt's identification of Wilkerson from a photo array and his statements to the detectives, both pre-advisement and post-advisement. Lefayt and Detectives Francis and Miller testified at the suppression hearing. Wilkerson did not call any witnesses or testify himself. During cross-examination of Detective Francis, defense counsel asked her whether she and her partner "went on for a few minutes before ... actually read[ing] him his *Miranda* rights," whether she discussed Wilkerson's electronic monitoring box, and "whether or not he had met up with a girl at the village center." Detective Francis responded in the affirmative as to each of these queries.

Defense counsel, as to the pre-advisement statements, argued generally to the trial judge that the interrogation constituted custodial interrogation within the contemplation of *Miranda* and, as such, the statements were not admissible without a voluntary waiver of his *Miranda* rights. Turning to the post-advisement statements, defense counsel argued:

> [T]here are four or five pages in the very beginning that there were some questions asked about having been at the village center, did you know a female, things like that, and that goes up to about page five before they even broach the subject of the *Miranda*. So, for those reasons, I think those are specifically interrogatory questions that certainly should be suppressed, *but even beyond that, I think that because that groundwork was laid, it laid the framework to taint sort of the rest of that, even after there was some Miranda.*

(Emphasis added.) Defense counsel made no mention of *Missouri v. Seibert,* nor any more specific complaint about police two-step or question-first tactics. In response to these arguments, the State—although conceding that Wilkerson was in custody for purposes of *Miranda,* such that the pre-advisement statements should be suppressed (as substantive evidence in the State's case-in-chief, but not for impeachment purposes)—argued generally that the post-advisement questioning was "*Miranda* compliant" and voluntary, noting that

Wilkerson "was certainly cognizant of what was happening; he was of an age, 17, where he can understand, and, as he indicated, he does understand the English language," and that as a "youthful offender," he is "certainly very savvy in terms of the criminal justice system . . ."

Ultimately, the trial judge suppressed the pre-advisement statements, explaining that because "there is no question this was a custodial interrogation . . . . [, considering that] the Defendant was flex cuffed when he went in for the interview with the two detectives," and that "there were questions asked for which he should have been *Mirandized* before giving those responses." The trial judge denied the motion with respect to the post-advisement statements, "find[ing] that the warnings that were given were adequate, they did meet the dictates of *Miranda*," and explaining that "based upon the totality of the circumstances . . . the statements made after the warnings were given were voluntary statements." Like defense counsel and the prosecutor, the trial judge made no mention of *Missouri v. Seibert*, nor engaged in an analysis of whether a prohibited (deliberate or otherwise) two-step or question-first tactics occurred.

The jury acquitted Wilkerson of first-degree rape, first-degree assault, and reckless endangerment, but found him guilty of second-degree rape, second-degree assault, and false imprisonment.[5] The Circuit Court merged the assault and false imprisonment convictions and, on 5 March 2009, sentenced Wilkerson to twenty-years' imprisonment, suspending all but eight years.

The Court of Special Appeals, in an unreported opinion, affirmed Wilkerson's convictions. Responding to the State's claim—similar to the one it makes to this Court—that Wilkerson's *Missouri v. Seibert* appellate argument was not preserved for appellate review, the Court of Special Appeals explained that, although defense "counsel did not present this

---

5. At trial, Wilkerson's defense was that Lefayt consented to have sexual intercourse with him.

argument as robustly as he does on appeal, . . . we think he sufficiently raised to the court's attention that the questioning before *Miranda* tainted the post-*Miranda* statements." Regarding the merits of Wilkerson's appellate *Seibert* claim, our appellate brethren explained:

> In this case, there was unquestionably a custodial interrogation, however, there is no evidence to support the contention that *Seibert* was violated. First, whereas *Buck* [*v. State,* 181 Md.App. 585, 956 A.2d 884 (2008) ] stressed that, in *Seibert* and *Cooper* [*v. State,* 163 Md.App. 70, 877 A.2d 1095 (2005) ], the police admitted that a two-step technique was deliberately used, there was no evidence presented at the suppression hearing that there was such an intent here. Second, whereas Seibert was questioned for thirty to forty minutes before being Mirandized, and Cooper's pre-*Miranda* interview lasted ninety minutes, defense counsel here asked the detective whether she questioned Wilkerson for a "few minutes" before being advised of his rights, to which the detective answered in the affirmative, and *Miranda* advisements appear on page four of the transcript of the recorded interview, which in total encompassed thirty transcript pages and lasted twenty-six minutes. Finally, and quite significantly, although Wilkerson was questioned for a short period of time before being advised of his rights, he neither made any incriminating statements before *Miranda* advisements nor afterwards. In fact, at trial, Wilkerson admitted that he met Lefayt that evening and testified that he engaged in consensual sex with her. However, when being questioned by the police, he denied not only raping Lefayt, but also having ever met her. For these reasons, we believe that no *Seibert* violation occurred.

Finally, addressing Wilkerson's argument that "his post-*Miranda* statements to the police should have been suppressed because he neither knowingly nor voluntarily waived his *Miranda* rights," the intermediate appellate court explained:

> We agree with the circuit court that Wilkerson failed to prove that he did not understand his rights or was coerced

to talk to the police. He responded in the affirmative each time the detectives informed him of a right and asked him whether he understood. Although he never signed a waiver, this was because he was in flex-cuffs, and, as the judge noted, "there is no requirement that the advice of rights form or waiver be actually signed by the Defendant or read by the Defendant." The interview was brief, lasting approximately twenty-six minutes, and Wilkerson told the detectives that he was not under the influence of drugs or alcohol. As the judge noted, although Wilkerson was only seventeen, he had numerous prior encounters with the juvenile justice system. Although the room in which the interrogation was conducted was small, it was in Wilkerson's own home, with only two police officers present. Although Wilkerson was in flex-cuffs during the interview, there was no evidence of physical or psychological coercion. Likewise, there was no evidence that promises were made to induce Wilkerson to talk, or that weapons were displayed or force was used to intimidate him. We agree with the circuit court that the detective's remark before advising Wilkerson of his rights that "these are really stupid questions" was a "poor choice of words." But based on the totality of the circumstances, we agree with the court's conclusion that Wilkerson talked to police knowingly and voluntarily.

Wilkerson filed a timely petition for writ of certiorari, which we granted, *Wilkerson v. State*, 417 Md. 384, 10 A.3d 199 (2010), to consider potentially:

I. Whether the trial court erred by not suppressing all of Mr. Wilkerson's statements because the police used a prohibited form of the "two-step" technique to circumvent *Miranda,* thereby tainting the entire interrogation.

II. Whether the deliberateness inquiry under *Missouri v. Seibert* ... requires only that police admit their deliberate use of the prohibited "two-step" interrogation technique.

III. Whether *Missouri v. Seibert* ... applies to both exculpatory and inculpatory statements.

IV.  Whether the trial court erred by failing to suppress all of Mr. Wilkerson's statements to the police because he neither knowingly nor voluntarily waived his *Miranda* rights.

The State filed a conditional cross-petition for writ of certiorari, which we granted, to consider potentially whether, "Wilkerson fail[ed] to preserve his claim that police officers deliberately used the two-step "question first" interrogation method prohibited by *Missouri v. Seibert?*" For reasons to be explained more fully *infra*, we remand the case to the Court of Special Appeals and direct ultimately that this case be remanded, pursuant to Maryland Rule 8–604(a)(5) and (d), to the Circuit Court for Howard County for further proceedings not inconsistent with this opinion.

## STANDARD OF REVIEW

When this Court reviews a trial court's denial of a motion to suppress, "we ordinarily consider only the information contained in the record of the suppression hearing, and not the trial record." *Lewis v. State*, 398 Md. 349, 358, 920 A.2d 1080, 1085 (2007); *see Byndloss v. State*, 391 Md. 462, 477, 893 A.2d 1119, 1128 (2006). "We view the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the prevailing party on the motion." *State v. Nieves*, 383 Md. 573, 581, 861 A.2d 62, 67 (2004). Despite extending great deference to the hearing judge's findings of fact, "we review independently the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law and, accordingly, should be suppressed." *Byndloss*, 391 Md. at 477, 893 A.2d at 1128.

## ANALYSIS

Albeit for different reasons and reaching different conclusions, both Wilkerson and the State ask us to consider and apply the Supreme Court's 2004 decision in *Missouri v. Seibert*. Any consideration of *Seibert*, however, begins with the Supreme Court's 1985 decision in *Oregon v. Elstad*, 470 U.S.

298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). *See United States v. Green*, 388 Fed.Appx. 375, 380 (5th Cir.2010) ("When juxtaposed, the Supreme Court's decisions in *Elstad* and *Seibert* provide the applicable analytic framework."); *Commonwealth v. Charleston*, 16 A.3d 505, 520 (Pa.Super.Ct.2011) ("In order to provide a cogent discussion of the *Seibert* decision, we must first address the seminal case of *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)."). In *Elstad*, Michael Elstad was implicated in the burglary of a neighbor's home. *Elstad*, 470 U.S. at 300, 105 S.Ct. at 1288, 84 L.Ed.2d at 226. After obtaining a warrant for Elstad's arrest, two police officers went to his house and began questioning him. *See Elstad*, 470 U.S. at 300–01, 105 S.Ct. at 1288, 84 L.Ed.2d at 226–27. One of the officers testified:

"I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, 'Yes, I was there.'"

*Elstad*, 470 U.S. at 301, 105 S.Ct. at 1288–89, 84 L.Ed.2d at 227. After being transported to the police station, Elstad was read his *Miranda* rights for the first time, and informed officers that he understood his rights and wanted to make a statement. *Elstad*, 470 U.S. at 301, 105 S.Ct. at 1289, 84 L.Ed.2d at 227. Elstad "gave a full statement, explaining that he had known that the Gross family was out of town and had been paid to lead several acquaintances to the Gross residence and show them how to gain entry [to the house]. . . ." *Id.* After his motion to suppress his statement was denied and he was found guilty of first-degree burglary, the Supreme Court granted certiorari eventually "to consider the question of whether the Self–Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but

unwarned admission from the defendant." *Elstad,* 470 U.S. at 303, 105 S.Ct. at 1290, 84 L.Ed.2d at 228.

The Supreme Court rejected the argument that the failure of the police to provide *Miranda* warnings prior to the earlier confession (i.e., "Yes, I was there.") must be excluded as "fruit of the poisonous tree"—drawing from Fourth Amendment jurisprudence—explaining:

> The *Miranda* exclusionary rule … serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.* Thus, in the individual case, *Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.
>
> \* \* \*
>
> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Elstad,* 470 U.S. at 306–07, 309, 105 S.Ct. at 1291–92, 1293, 84 L.Ed.2d at 230–31, 232.

Addressing whether the unwarned statement could render the post-advisement statements involuntary, the Supreme Court elaborated:

When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession.

* * *

There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but noncoercive question, as in this case. . . .

* * *

We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

* * *

Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his state-

ments.... We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings. *Elstad,* 470 U.S. at 310, 312–14, 318, 105 S.Ct. at 1293, 1295–96, 1207–98, 84 L.Ed.2d at 232–33, 235, 238. Thus, *Elstad*—at least until *Seibert*—"clearly stands for the proposition that the mere inadvertent failure of the police to advise the defendant of his *Miranda* rights does not *forever contaminate* defendant's statements after he has been given the appropriate warnings." *People v. Green,* 179 Ill.App.3d 1, 128 Ill.Dec. 902, 535 N.E.2d 413, 469 (1988) (emphasis added); *see United States v. Conley,* 156 F.3d 78, 84 (1st Cir.1998).[6]

Although the Court in *Elstad* held that unwarned statements do not "forever contaminate" any and all post-advisement statements, the Court left open the possibility that, in some circumstances, such pre-warning statements may taint post-advisement questioning. Enter *Missouri v. Seibert.* In *Seibert,* Seibert feared charges of child neglect following the death of her 12–year old son who was suffering from cerebral palsy. She devised a plan in which another of her sons and his friends would incinerate his body by setting the family's mobile home on fire. So as not to create an appearance that her afflicted son was left unattended, they planned to leave in the house a mentally-ill teenager who was living with the family. Seibert's son and a friend set the fire ultimately, and the mentally-ill boy died.

Police interrogation of Seibert about that night's events revealed the following:

[T]he police awakened Seibert at 3 a.m. at a hospital where [her son] was being treated for burns. In arresting her, Officer Kevin Clinton followed instructions from Rolla, Mis-

---

**6.** For cases from this Court discussing and applying *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), see *Miller v. State,* 380 Md. 1, 843 A.2d 803 (2004) and *Williams v. State,* 342 Md. 724, 679 A.2d 1106 (1996). For a recent case discussing and applying *Seibert,* see *Robinson v. State,* 419 Md. 602, 616–25, 19 A.3d 952 (2011).

souri, Officer Richard Hanrahan that he refrain from giving *Miranda* warnings. After Seibert had been taken to the police station and left alone in an interview room for 15 to 20 minutes, Hanrahan questioned her without *Miranda* warnings for 30 to 40 minutes, squeezing her arm and repeating "Donald was also to die in his sleep." After Seibert finally admitted she knew Donald was meant to die in the fire, she was given a 20–minute coffee and cigarette break. Officer Hanrahan then turned on a tape recorder, gave Seibert the *Miranda* warnings, and obtained a signed waiver of rights from her. He resumed the questioning with "Ok, 'trice, we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?"

*Seibert,* 542 U.S. at 604–05, 124 S.Ct. at 2606, 159 L.Ed.2d at 650 (internal citations omitted). Following a waiver of her *Miranda* rights, Seibert admitted that the boy "was supposed to die in his sleep." *Seibert,* 542 U.S. at 604–05, 124 S.Ct. at 2606, 159 L.Ed.2d at 650. The trial court admitted the post-advisement statements, and Seibert was found guilty of second-degree murder. The Supreme Court granted certiorari to determine whether pre-advisement statements made in conjunction with a deliberate withholding of *Miranda* warnings taint all statements given post-advisement, such that the later statements are inadmissible as violative of the principles of *Miranda.* Such interrogation tactics have been referred to as either "two-step" or "question first" interrogations. *See generally* Eric English, *You Have the Right to Remain Silent, supra.*

In explaining the ills of two-step interrogations, Justice Souter, writing for the four-Justice plurality, explained:

> Just as "no talismanic incantation [is] required to satisfy [*Miranda's* ] strictures," *California v. Prysock,* 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (per curiam), it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance.... The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could

function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

There is no doubt about the answer that proponents of question-first give to this question about the effectiveness of warnings given only after successful interrogation, and we think their answer is correct. By any objective measure, applied to circumstances exemplified here, it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. After all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings,[7] the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.... Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to

---

7. In *Rush v. State,* 403 Md. 68, 92, 939 A.2d 689, 703 (2008), we held that a defendant's post-advisement statements are not inadmissible where the "preliminary questioning [i]s properly characterized ... as 'introductory in nature.'"

his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

*Seibert*, 542 U.S. at 611–14, 124 S.Ct. at 2610–11, 159 L.Ed.2d at 654–56.

In distinguishing the facts before it from those with which the Court was confronted in *Elstad*, the plurality enumerated a list of factors to apply in the evaluation of such question-first interrogation cases, and held ultimately that Seibert's post-advisement statements were inadmissible:

The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. In *Elstad*, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.

At the opposite extreme are the facts here, which by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings. The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing

to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used.... The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before.

*Seibert,* 542 U.S. at 615–17, 124 S.Ct. at 2612–13, 159 L.Ed.2d at 657–58; *see, e.g., United States v. Crisp,* 371 Fed.Appx. 925, 929 (10th Cir.2010) (referring to the *Seibert* plurality's "five-factor test").

Applying *Seibert* going forward is complicated because the opinion of the Court was only joined by four Justices, making it a plurality opinion. *See In re Chocolate Confectionary Antitrust Litig.,* 602 F.Supp.2d 538, 562 (M.D.Pa.2009) ("Application of . . . a plurality decision[ ] is somewhat complicated in that it contains multiple perspectives on the theory."). Justice Kennedy authored a concurring opinion, offering what he called "a narrower test applicable only in the infrequent case...." Whereas "[t]he plurality conclude[d] that whenever a two-stage interview occurs, admissibility of the postwarning statement should depend on whether [the] *Miranda* warnings delivered midstream could have been effective enough to accomplish their object given the specific facts of the case," Justice Kennedy would hold that "[t]he admissibility of post-warning statements should continue to be governed by the principles of *Elstad unless the deliberate two-step strategy was employed." Seibert,* 542 U.S. at 621, 622, 124 S.Ct. at 2615–16, 159 L.Ed.2d at 661 (Kennedy, J. concurring) (emphasis added) (internal quotation marks omitted). In that rare case, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement

is made." [8]  *Seibert,* 542 U.S. at 622, 124 S.Ct. at 2616, 159 L.Ed.2d at 661 (Kennedy, J., concurring). Applying his framework to the facts in *Seibert,* Justice Kennedy would have held that, because the police used a deliberate two-step tactic and "no curative steps were taken in this case ... [,]the postwarning statements are inadmissible and the conviction cannot stand." *Seibert,* 542 U.S. at 622, 124 S.Ct. at 2616, 159 L.Ed.2d at 661–62 (Kennedy, J, concurring).

Consistent with the principle that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds," *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 266 (1977) (internal quotation marks and citation omitted), the overwhelming majority of courts to decide the issue post-*Seibert* hold that Justice Kennedy's concurring opinion controls a *Seibert*-type analysis.[9]  *See Robinson v. State,* 419 Md. 602, 621–23, 622 n. 3, 19 A.3d 952 (2011) (citing with approval the Court of Special Appeals's holding that "Justice Kennedy's opinion represents the 'holding' of the *Seibert* Court"); *see, e.g., United States v. Torres–Lona,* 491 F.3d 750, 758 (8th Cir.2007); *United States v.*

---

**8.** Justice Kennedy offered that "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances," or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient" to constitute such "curative measures." *Seibert,* 542 U.S. at 622, 124 S.Ct. at 2616, 159 L.Ed.2d at 661; *see Robinson v. State,* 419 Md. 602, 623, 19 A.3d 952 (2011) (holding that a five-week period between interrogations did not constitute a sufficient "substantial break in circumstances" where the " 'break in time' ... was certainly not 'designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and the *Miranda* waiver' ").

**9.** Those courts that agree that Justice Kennedy's concurrence controls differ as to how to apply precisely his analytical framework. *See generally* ANDREW V. JEZIC ET AL., MARYLAND LAW OF CONFESSIONS § 14:10 (2010–11 ed.). Because, as explained more fully *infra,* we do not reach the merits of Wilkerson's appellate *Seibert* claim at this time, we need not decide today how we would apply Justice Kennedy's framework.

*Carter,* 489 F.3d 528, 535 (2d Cir.2007); *United States v. Mashburn,* 406 F.3d 303, 308–09 (4th Cir.2005); *State v. Gaw,* 285 S.W.3d 318, 324 (Mo.2009); *Ford v. United States,* 931 A.2d 1045, 1051–52 (D.C.2007); *Cooper v. State,* 163 Md.App. 70, 89, 877 A.2d 1095, 1106 (2005); *see also Shatzer v. State,* 405 Md. 585, 626–27, 954 A.2d 1118, 1142–43 (2008) (Harrell, J., dissenting), *rev'd, Maryland v. Shatzer,* —— U.S. ——, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010). *But see, e.g., United States v. Pacheco–Lopez,* 531 F.3d 420, 427 n. 11 (6th Cir.2008) ("[O]ther [courts] have raised doubts about whether [Justice Kennedy's] concurrence actually represents the narrowest grounds for decision."); *United States v. Carrizales–Toledo,* 454 F.3d 1142, 1151 (10th Cir.2006) ("Determining the proper application of the *Marks* rule to [*Seibert*] is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court."); *State v. Pye,* 282 Ga. 796, 653 S.E.2d 450, 453 n. 6 (2007).

██  In the present case, the State argues that Wilkerson's *Seibert* appellate contention was not preserved for appellate review, suggesting that "it should be incumbent on a defendant to raise the substance of the claim with sufficient clarity to enable the trial court and the State to address it." As the State reads the transcript of the suppression hearing, Wilkerson "did not argue that the delay was deliberate, or that it was to avoid the requirements of *Miranda,* or that it was a two-step technique, or that it violated *Seibert,*" and that, although arguing that the pre-advisement questioning "tainted" the post-advisement statements, "that term ['taint'] is also used to refer to many other kinds of alleged legal errors." In response, Wilkerson argues that, considering "the context in which defense counsel raised [the] 'taint'—in a hearing in a motion to suppress Mr. Wilkerson's statements made both before and after [a] *Miranda* warning[ ]," " 'taint' could only have referred to a *Seibert* violation."

At bottom, the question the parties in the present case would have us answer initially is whether Wilkerson's trial defense counsel, by stating during her argument directed to

the post-advisement statements, yet alluding also to the pre-advisement statements, "I think that because that groundwork was laid, it laid the framework to taint sort of the rest of that, even after there was some *Miranda*," raised the issue sufficiently to preserve Wilkerson's rather more focused *Seibert* appellate claim for review.[10]   The State would have us answer

---

**10.** Although in applying a *Seibert*-type analysis, "the first step ... is to determine whether a staged interrogation process was used as a deliberate strategy," *United States v. Briones*, 390 F.3d 610, 614 (8th Cir. 2004), "Justice Kennedy's opinion is silent as to what, if any, presumptions apply or which party bears the burden of proving or disproving deliberateness." *United States v. Williams*, 435 F.3d 1148, 1158 n. 11 (9th Cir.2006); *see United States v. Capers*, 627 F.3d 470, 478 (2d Cir.2010).  Lower federal courts and state courts alike addressing this point hold unanimously, however, that "the government bears the burden of proving the police did *not* deliberately withhold the warnings until after they had an initial inculpatory statement in hand." *United States v. Stewart*, 536 F.3d 714, 719 (7th Cir.2008); *see Capers*, 627 F.3d at 479; *Torres–Lona*, 491 F.3d at 758; *United States v. Ollie*, 442 F.3d 1135, 1142–43 (8th Cir.2006); *Ross v. State*, 45 So.3d 403, 426 (Fla. 2010); *People v. Angoco*, 2007 Guam 1 ¶ 29, 2007 WL 951496.  That the burden lies ultimately with the State to show deliberateness does not absolve, however, a defendant in a criminal case from raising an issue with sufficient clarity at trial in order to preserve that issue for appellate review.

We note also that the State's burden does not arise in all cases. We imagine a case where a defendant made statements to law enforcement both before and after a *Miranda* waiver and moves to suppress the post-advisement statements, but argues only that the totality of the circumstances surrounding the interrogation was such that the post-advisement statements were made unknowingly and involuntarily (i.e., does not raise a *Seibert* issue). *See Fare v. Michael C.*, 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197, 212 (1979) ("[T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights...."). In such a case, must the prosecution prove that the delay in giving the *Miranda* warnings was not deliberate, even where the defense has not as much as hinted at a *Seibert* violation? We think not, and our conclusion is bolstered by language in cases from other jurisdictions. *See Torres–Lona*, 491 F.3d at 758 ("*Where a defendant alleges* that his post *Miranda* statement was obtained in the course of a two part interrogation, the prosecution bears the burden ....") (emphasis added); *Ollie*, 442 F.3d at 1142–43 ("[W]hen a defendant moves to suppress a post-warning statement *that he contends was given as part of a question-first interrogation*, the prosecution must prove ....") (emphasis added); *Martinez v. State*, 272 S.W.3d 615, 619 n. 10 (Tex.

this question in the negative and affirm the judgment of the Court of Special Appeals. On the other hand, Wilkerson would have us answer in the affirmative, reach the merits of his *Seibert* claim, find that the police detectives engaged in a deliberate two-step tactic such that certain of his post-advisement statements should have been suppressed, and remand the case to the Circuit Court for a new trial. We shall do neither at this point.

Maryland Rule 8–131 ("Scope of review") provides, in pertinent part, that "[o]rdinarily, [an] appellate court will not decide any ... issue unless it *plainly appears* by the record to have been raised in or decided by the trial court...." (Emphasis added.) We have stated repeatedly that "[t]his rule was adopted to promote the orderly administration of the law and fairness to the opposite party." *Davis v. State*, 189 Md. 269, 273, 55 A.2d 702, 704 (1947); *see State v. Bell*, 334 Md. 178, 189–90, 638 A.2d 107, 113 (1994). The Rule operates to "promote the orderly administration of the law," by "prevent[ing] the trial of cases in a piecemeal fashion, thereby saving time and expense and accelerating the termination of litigation." *Zellinger v. CRC Dev. Corp.*, 281 Md. 614, 620, 380 A.2d 1064, 1067–68 (1977). Further, by ordinarily only addressing issues "raised in or decided by the trial court," the Rule serves to prevent the unfairness that could arise when a party raises an issue for the first time on appeal, thus depriving the opposing party from admitting evidence relating to that issue at trial. Moreover, as is often the case, appellate courts need trial courts to explicate, to some degree, just what they are deciding or finding so that we may perform our tasks.

Crim.App.2008) (*"When a defendant alleges that the Miranda* protections were thwarted, the burden of showing admissibility rests on the prosecution."*) (emphasis added). Accordingly, although we adopt the notion that the prosecution bears the burden of showing that the withholding of *Miranda* advice was not deliberate, we hold that such a burden only attaches once the defendant alleges sufficiently that law enforcement, in fact, employed two-step or question-first interrogation tactics.

The question of whether a *Seibert* challenge "plainly appears [on] the record" to have been raised in or decided by the trial court in the present case is too close to call. *See McClendon v. Commonwealth,* No. 2009–SC–000283–MR, 2010 WL 3722788, at *1–*2, 2010 Ky. Unpub. LEXIS 83, at *4–*5 (Ky.2010) (finding the issue of whether an issue was preserved for appellate review "a very close call"). It would not be fanciful wholly to contend, as Wilkerson does, that his trial defense counsel intended to allude to a *Seibert* challenge in her argument to the trial judge, albeit in a somewhat oblique and obscure fashion. On the other hand, the "taint" argument was preceded immediately [11] and followed immediately [12] by arguments relating to general voluntariness of Wilkerson's statements and the potential deficiency in the *Miranda* warnings. Such an argument did not alert apparently either the prosecutor or the trial judge such that they should respond to or rule on, respectively, a *Seibert* challenge.[13] Rather, it seems that the prosecutor and the trial judge perceived that

11. Preceding immediately the "taint" argument is defense counsel's invocation of a case titled *Walker v. State,* authored purportedly by Judge Moylan for the Court of Special Appeals, which defense counsel cited for the proposition that "age is a highly relevant factor to be considered" in a voluntariness assessment. *See Walker v. State,* 12 Md.App. 684, 708, 280 A.2d 260, 272 (1971) (stating that, although "age ... alone is not dispositive," "[a]ge is, nevertheless, a highly-relevant factor").

12. Following immediately the "taint" argument was defense counsel's argument regarding "the manner that [*Miranda* ] was given sort of cursorily and with a preface that gave some indication that [it wa]s just fluff, don't even really worry about it, it's not important."

13. None of the evaluative factors of the *Seibert* plurality opinion or Justice Kennedy's concurring opinion were the stuff of argument by counsel or trial court findings here. It should come as no surprise, therefore, that it is apparent from the transcript of the suppression hearing that neither the trial judge nor the prosecutor perceived a *Seibert* challenge to have been engaged. As an appellate court, we are not charged with making such first-level findings of deliberateness or other elements of that which *Seibert* prohibits. *See Chew v. State,* 317 Md. 233, 245, 562 A.2d 1270, 1276 (1989) (stating that "an appellate court will give great deference to the first level findings ... made by a trial judge," thus implying that it is not the appellate court's responsibility to make such findings in the first instance).

Wilkerson's counsel was raising an *Elstad* challenge. The State is correct that Wilkerson "did not argue that the delay [in giving him *Miranda* warnings] was deliberate, or that it was to avoid the requirements of *Miranda,* or that it was a two-step technique, or that it violated *Seibert* or any other case." Clearly, the trial judge did not rule on a *Seibert* challenge, if in fact one was raised. We believe that the appropriate disposition of the present case is a limited remand to the Circuit Court for additional evidence—should the parties choose to introduce it—and argument on a clear *Seibert* challenge and appropriate findings by the trial judge.

Maryland Rule 8–604 ("Disposition") provides, in pertinent part:

(a) *Generally.*—As to each party to an appeal, the Court shall dispose of an appeal in one of the following ways:

\* \* \*

(5) remand the action to a lower court in accordance with section (d) of this Rule....

\* \* \*

(d) *Remand.*—

(1) *Generally.*—If the Court concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court. In the order remanding a case, the appellate court shall state the purpose for the remand. The order of remand and the opinion upon which the order is based are conclusive as to the points decided. Upon remand, the lower court shall conduct any further proceedings necessary to determine the action in accordance with the opinion and order of the appellate court.

Although ordering a limited remand is a relatively infrequent action taken by this Court, our jurisprudence "is replete with examples where a limited remand is proper." *Montgomery Mut. Ins. Co. v. Chesson,* 399 Md. 314, 334, 923 A.2d 939, 950 (2007); *see Southern v. State,* 371 Md. 93, 104, 807 A.2d 13, 19 (2002) ("There are certain times and types of cases where the limited remand is the proper disposition...."). We have said

that a limited remand is proper "particularly when the purposes of justice will be advanced by permitting further proceedings." *Southern*, 371 Md. at 104, 807 A.2d at 19–20. Given the (at best) obscure framing at trial of Wilkerson's supposed *Seibert* challenge and the absence of responsive evidence or arguments, and most importantly the absence of *Seibert* fact-finding by the trial court, "the purposes of justice will be advanced by permitting further proceedings."

Because it seems to us that it was because of Wilkerson's trial counsel's choice of language that her putative *Seibert* challenge did not register on the State's radar, the State was deprived of the opportunity to lift the yoke of attempting to prove that the delay in advising Wilkerson of his *Miranda* rights was not deliberate and that any question-first or two-step tactics were absent from the interrogation. To this point, Wilkerson argues that "[n]either the State nor Mr. Wilkerson need[ ] . . . ask additional questions about 'the reason for the delay.'" Certainly, however, explicit questioning by the State of the interrogating officers of whether they were acting to withhold *Miranda* warnings—as in *Seibert*—would be germane to the State's burden to show that the delay was not deliberate. Wilkerson, in his brief, continues: "It is not likely that the detectives would have admitted deliberate use of the technique. . . ." Although we are cognizant of Justice Souter's comment that "the intent of the officer will rarely be as candidly admitted as it was" in *Seibert, Seibert*, 542 U.S. at 616 n. 6, 124 S.Ct. at 2612 n. 6, 159 L.Ed.2d at 657 n. 6, we note that officers have admitted to such conduct in a number of reported opinions nationwide. *See, e.g., Seibert*, 542 U.S. at 605–06, 124 S.Ct. at 2606, 159 L.Ed.2d at 651; *Cal. Attorneys for Criminal Justice v. Butts*, 195 F.3d 1039, 1041 (9th Cir. 1999). In any event, absent such an admission, courts look to "the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." *Capers*, 627 F.3d at 479. Such evidence, relating to the factors as set forth in the plurality opinion in *Seibert*—i.e., "the completeness and detail of the questions and answers in the first round of

interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first"—is different likely from evidence the State might elicit regarding the general voluntariness of Wilkerson's statements, which analysis focuses on, among other things, "the suspect's age, intelligence, education, experience, suggestibility, and mental and physical health; the police officers' treatment of the suspect; and the methods and length of the interrogation." *McIntyre v. State,* 309 Md. 607, 621 n. 4, 526 A.2d 30, 37 n. 4 (1987). Although Wilkerson argues that there is evidence in the record relating to *Seibert's* deliberateness factors—a point we do not disagree with entirely—it is clear that the State (and the trial judge) did not perceive that a *Seibert* argument was raised there, and we cannot say that their obliviousness was their fault entirely.

Considering the foregoing, although we appreciate that "[t]here must be an end to litigation," *Earl v. Anchor Pontiac Buick, Inc.,* 246 Md. 653, 659, 229 A.2d 412, 416 (1967), out of "basic fairness to ... opposing counsel," and because "the purposes of justice will be advanced by permitting further proceedings," we believe that these policies underlying Rules 8–131 and 8–604, respectively, would be served best with a limited remand to the Circuit Court. *See Fitzgerald v. State,* 384 Md. 484, 505, 864 A.2d 1006, 1018–19 (2004) (holding that a limited remand is the appropriate disposition where addressing the issue on appeal "would prejudice unfairly the State because the State did not have the opportunity to present evidence on this complex issue"). We emphasize that "[t]his remand is limited in scope, and we do not order a new trial unless and until the trial court makes certain determinations...." *Church v. State,* 408 Md. 650, 672, 971 A.2d 280, 292 (2009).

On remand, the Circuit Court should conduct a supplemental suppression hearing, allowing both the State and Wilkerson the opportunity to present additional evidence and/or argument on a *Seibert* challenge. The Circuit Court, in the first

instance, must determine whether the delay in giving Wilkerson the *Miranda* advisements was deliberate, or that two-step/question-first tactics were used during the 6 December 2007 interrogation.[14, 15, 16]

## CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR FURTHER PROCEEDINGS NOT INCONSIS-

---

14. The parties in the case before us spar over the extent to which *Seibert*—assuming a *Seibert* violation—operates to bar the admissibility of exculpatory statements in the prosecution's case-in-chief. In *Miranda v. Arizona*, 384 U.S. at 476, 86 S.Ct. at 1629, 16 L.Ed.2d at 725, the Supreme Court explained:

   [N]o distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word. . . .

   These words ring true in the present case. In essence, the trial of this case unfolded as a classic he-said-she-said case. Accordingly, to the extent that any post-advisement questioning is deemed by the trial court to have been in violation of *Seibert* (an issue upon which we express no opinion), that Wilkerson gave a full statement about not being the one to engage in sexual intercourse—a stance at odds with his defense of consent at trial—could have been used to impeach his defense at trial. *See Edwards v. United States*, 923 A.2d 840, 850 (D.C.2007) (stating that subscribing to an inculpatory-exculpatory dichotomy for purposes of *Seibert* "would run contrary to the purpose of *Miranda*"); *People v. Brown*, No. H026138, 2004 WL 2384330, at *10–*11, 2004 Cal.App. Unpub. LEXIS 9754, at *31–*32 (Cal.Ct.App.2004) ("We recognize that in *Seibert* the defendant gave a confession whereas here defendant made exculpatory admissions. However, any statement, whether inculpatory or exculpatory, which the prosecution introduces at trial, is incriminating."); *see also Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 272 n. 6, 734 A.2d 227, 235 n. 6 (1999) ("[T]his Court may decide issues for guidance on remand.").

15. *See McMillian v. State*, 325 Md. 272, 288, 600 A.2d 430, 438 (1992) (vacating the judgment of the Court of Special Appeals "without affirmance or reversal of the [trial] judgments . . . so that [the trial court's] decision on McMillan's motion to suppress may be reconsidered"); *see also Klingenstein v. State*, 330 Md. 402, 624 A.2d 532 (1993) (similar).

16. A limited remand is appropriate in the circumstances of the present case because a *Seibert* challenge is for the trial judge solely to decide.

TENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO ABIDE THE RESULT.

## *ORDER*

PER CURIAM ORDER.

Upon consideration of the parties' briefs, record extract, and oral argument on 9 May 2011, it is this 14th day of July, 2011,

---

*See United States v. Capers,* 627 F.3d 470, 479 (2d Cir.2010) (holding that *"a court* should ... determine deliberateness") (emphasis added). Although Maryland employs a "two-step procedure ... regarding the admission of [custodial statements], with the trial judge initially determining voluntariness, admitting the [statements] into evidence only if he finds it to be voluntary, and the jury then making the final decision on voluntariness," *Dempsey v. State,* 277 Md. 134, 143, 355 A.2d 455, 460 (1976), a *Seibert* challenge is different wholly from a typical voluntariness challenge. *See Capers,* 627 F.3d at 479 (noting that the "question of deliberateness" is "distinct from voluntariness"). We explain.

In *Miranda,* the Supreme Court held that "unless and until [*Miranda* ] warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. Thus, under *Miranda,* "unwarned statements *that are otherwise voluntary ...* must nevertheless be excluded from evidence...." *Elstad,* 470 U.S. at 307, 105 S.Ct. at 1292, 84 L.Ed.2d at 231 (emphasis added); *see id.* (*"Miranda's* preventative medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm."). After *Miranda,* then, a trial court's initial task is to determine whether valid warnings were given and whether there was a knowing and intelligent waiver of those warnings, and *not* whether any statements made were "voluntary." *Seibert* answered in the affirmative the question of whether two-step or interrogation-first interrogation tactics so tainted, not the general voluntariness of any post-advisement statements made, but the effectiveness of the advisements themselves. *See Seibert,* 542 U.S. at 611–12, 124 S.Ct. at 2610, 159 L.Ed.2d at 655 ("The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."). Accordingly, *Seibert* and voluntariness challenges are cut from different cloth, such that the former is not subjected to the two layers of trial-level scrutiny applied to the latter.

Wilkerson raised a voluntariness challenge in the trial court, before the suppression judge and the jury, but does not pursue that before us as to his post-advisement statements. Thus, the limited remand ordered here has no effect on his abandoned voluntariness challenge.

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring with this Order and opinion filed in this case on July 14, 2011, that this case be remanded, without affirmance or reversal, to the Court of Special Appeals, pursuant to Maryland Rule 8–604(a)(5) and (d)(1) (the prerequisite findings under the latter Rule section having been made by this Court), with directions that the Court of Special Appeals remand the case to the Circuit Court for Howard County for further proceedings, not inconsistent with this Court's opinion, to:

1. Conduct a supplemental suppression hearing, allowing the parties the opportunity, should they choose, to present additional evidence and/or argument regarding whether the Howard County Police Department detectives engaged in any deliberate "two-step" or "question-first" interrogation tactics, prohibited under *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), in interrogating Wilkerson on 6 December 2007; and

2. Determine whether the delay in giving Wilkerson the *Miranda* advisements was deliberate so that "two-step" or "question-first" tactics may have been used during the 6 December 2007 interrogation;

and it is further

ORDERED that, upon conclusion of the further proceedings, if the trial court determines that the delay in giving Wilkerson *Miranda* advisements was not deliberate, or that "two-step" or "question-first" tactics were not used during the interrogation of Wilkerson, the Court of Special Appeals's prior opinion in this matter may be re-visited, as necessary, and Wilkerson may renew prosecution of this appeal; and it is further

ORDERED that, upon conclusion of the further proceedings, if the trial court determines that a "two-step" or "question-first" tactic was employed and that the State did not meet its burden in proving that the delay in withholding Wilkerson's *Miranda* advisements was not deliberate, such that the trial

court grants Wilkerson's motion to suppress his post-advisement statements, the State remains entitled to its appeal right, as provided for in Maryland Code (1974, 2006 Repl.Vol.), Courts and Judicial Proceedings Article, § 12–302(3)(i); and it is further

ORDERED that, upon conclusion of the further proceedings, if the trial court determines that a "two-step" or "question-first" tactic was employed, and that the State did not meet its burden in proving that the delay in withholding Wilkerson's *Miranda* advisements was not deliberate, the Court of Special Appeals's opinion and mandate shall be vacated because Wilkerson would be entitled to a new trial, during which his post-advisement statements that are related to the substance of pre-advisement statements shall be excluded.